## McARTHUR & HURLBERT vs. SEARS.

In an action against the owners of a steamboat as *common carriers*, where the boat stranded in entering a harbor in the night time, in consequence of the master mistaking a light upon a stranded vessel for a light usually exhibited by the keeper of the beacon light, by means whereof the plaintiffs sustained damage; *it was held*, that nothing will excuse the *common carrier*, except the two ordinary excepted cases; *inevitable accident without the intervention of man*, and *the acts of public enemies;* that neither of the exceptions existed in this case; and that proof of the utmost vigilance and care on the part of the master was irrelevant and inadmissible in defence of the action.

The rule of law is the same in respect to *a carrier by water* as to *a carrier by land;* nor is there any distinction whether the navigation be upon the *ordinary rivers,* or the *great rivers* and *lakes* or *inland seas* of this country, except so far as the exceptions in favor of the carrier are extended to the *perils* or *dangers of the rivers* or *lakes,* by the special terms of the contract contained in the charter party or bill of lading.

The clause, " except the perils or dangers of the rivers or lakes," and various cases arising under it, cited, considered and commented upon.

Where, in the testimony of a witness taken under a commission, a *mistake* occurs in reference to the *time* of the transaction testified to, evidence is admissible to show the mistake and fix the true time.

THIS was an action on the case against the defendant as a *common carrier,* for the loss of 154 barrels of oysters shipped at *Buffalo,* to be transported across *Lake Erie* to *Detroit,* tried at the Albany circuit, before the Hon. JOHN P. CUSHMAN, one of the circuit Judges.

The oysters were shipped in the month of November, 1835, on board the steamboat Columbus, belonging to the

McArthur v. Sears.

defendants. The master was directed to ship them below deck, but placed a portion of them on the promenade deck. In attempting to enter the port of *Erie* or *Presque Isle Bay*, an intermediate port between Buffalo and Detroit, the vessel grounded, and a portion of the oysters were thrown overboard to relieve the vessel, and the residue, in consequence of the grounding of the vessel, were frozen. The disaster to the vessel happened under these circumstances: It was night when the vessel approached the harbor of *Erie*, the weather was hazy, with flurries of snow. The beacon light on the end of the pier was seen occasionally through the flurries of snow. Besides the beacon light, there was usually a light at the window of the house of the keeper of the beacon light, bearing west-southwest about 50 rods distant from the beacon light, and the usual way of steering into the channel was to bring the beacon light and the light in the keeper's house into a range, and take them as a guide in entering the harbor. A light was observed, which was supposed to be the light in the keeper's house, but which proved to be a light on board another steamboat, the *North America*, which had been driven ashore in a previous gale, and in navigating the vessel so as to bring in a range the two lights, that is, the beacon light and the light on board the North America, which was mistaken for the light in the keeper's house, the boat struck on a shoal. After she struck and got on the shoal, the wind blew hard, the sea ran high and the vessel labored, strained and pounded very hard, which made it necessary to throw the oysters overboard to save the vessel and cargo. It was proved that the master of the Columbus was one of the most competent masters of steamboats on the lake, and that the most prudent master might have run his boat ashore under the existing circumstances. The facts above stated, in reference to the disaster, appeared by the *depositions* of two experienced seamen taken under a *commission*. From the language of the interrogatories and answers, these witnesses are made to speak as if the transaction had taken place in November, 1836, instead of 1835. The defendants offered to prove that the *time* referred to in the depositions

was in fact 1835, by showing that the Columbus did not sail in the year 1836, and otherwise, that the depositions related to the transaction in question ; but the explanatory testimony was objected to, and rejected by the judge. The counsel for the plaintiff then insisted that the depositions should be excluded : 1. Because they related to a transaction which happened in 1836, whilst the subject matter in controversy arose in 1835 ; and 2. If they related to the matter in controversy, the testimony was irrelevant, and proved nothing material to the defence. The judge excluded the depositions, and the jury, under his direction found a verdict in favor of the plaintiffs for $1506 86. The defendant moved for a new trial.

*M. T. Reynolds*, for the defendant.

*J. Holmes & S. Stevens*, for the plaintiffs.

*By the Court*, COWEN, J. The first ground of objection to the depositions is, we think, clearly untenable. Nothing is better settled than that a party may set his own witnesses right by other evidence of a material fact, even though it contradict and tend indirectly to discredit them. Phil. Ev. 7th Lond. ed. 309. Id. 8th Lond. ed. 902, and the cases there cited. Savage, Ch. J. in *Lawrence* v. *Barker*, 5 Wendell, 305. *Jackson ex dem. Hopkins* v. *Leek*, 12 id. 105. Livingston, J. in *Steinback* v. *The Col. Ins. Co.* 2 Caines' R. 131. This should be especially so, being offered by way of correcting a mere date, into a mistake of which the witnesses were probably led by the interrogatories, and which, of all facts, slides the easiest from the memory. In reason, the rule applies as well to depositions as to oral evidence. Admitting, however, that the depositions are thus explainable, it is insisted that they did not tend to establish the point in issue. No doubt they were incompetent, if this be so, and were properly excluded.

The matter of the depositions is said to be irrelevant : 1. Because the defendant, having violated his instructions in the manner of stowing the oysters, forfeited all right to de-

fend himself even on the narrow ground that the loss was by the act of God; secondly, that the matter does not tend to show the latter excuse. It is an answer to the first that a portion of the oysters were properly stowed, and yet the verdict was for the value of the whole. The second objection involves the inquiry whether the depositions tended in the least totally to exculpate the defendant from the charge of neglect, and link the disaster to inevitable causes disconnected with human agency. The defendant was a common carrier; and it is not denied as a general rule, that, to protect himself from responsibility for the loss, he was bound to prove that it arose from the act of God, or the enemies of the country. To the latter, the proof offered makes no pretensions; and it was thrown out in argument that the former part of the rule has no application to carriers navigating the dangerous waters of Lake Erie. No such local exception is known to the law of England or Scotland, whatever the general dangers of the navigation. 2 Kent's Comm. 597, 607, 608, 3d ed. Nor can it be indulged with safety either in principle or practice. No such exception has been made by any case in this state; nor am I aware that it has ever been contended for, though there have been several closely litigated suits for losses by carriers upon our great lakes. I do not find that it has been recognized by any case in the neighboring states; and distinctions in favor of carriers by water generally, which have been countenanced in one case, *Aymar* v. *Astor*, 6 Cowen, 266, by a dictum of the late chief justice of this state, and by two or three cases in Pennsylvania, have been treated as unfounded anomalies, to be disapproved as contrary to decisions in neighboring states, and even in our own. Story on Bailm. 323, § 497. 2 Kent's Comm. 607, 8, 3d ed. *Crosby* v. *Fitch*, 12 Conn. R. 419. In *Elliott* v. *Rozell*, 10 Johns. R. 1, the rule was applied to the navigation of the River St. Lawrence in scows, late in the season, between Ogdensburgh and Montreal, which was known by the shippers to be very dangerous. See also *Kemp* v. *Coughtry*, 11 Johns. R. 107. *Colt* v. *M'Mechen*, 6 Johns. R. 160. *Harrington* v. *Lyles*, 2 Nott & M'Cord, 88, 9, and the

cases there cited. *Williams* v. *Grant*, 1 Conn. R. 487, and several cases hereafter cited. *Bell* v. *Reed*, 4 Binn. 127, was like the one at bar, a case of navigation on Lake Erie ; and proceeded throughout on the assumption that the defendants must, in order to excuse the loss, prove the utmost care in themselves, and convince the jury that the loss arose from the act of God.

In *Gordon* v. *Little*, 8 Serg. & Rawle, 533, it was held that a *general usage*, softening the responsibility of carriers on the western waters, was admissible in their defence. This was the case of a keel boat sailing from Pittsburg in Pennsylvania, to Hopkinsville, Kentucky. But no offer of that kind was made in the case at bar ; and it may be very questionable, since the late cases in this court denying all restriction even by notice, whether such a custom, which must arise from the management of carriers, would be sustainable in true policy, owing to the opening which it gives for fraud and collusion, &c. In *Aymar* v. *Astor*, before cited, and *The Schooner Reeside*, 2 Sumn. 567, 560, a general commercial custom enlarging the phrase *perils* or *dangers* of the seas, in a bill of lading, so as to comprehend causes of loss beyond their legal import, was denied. Mr. Justice Story, in the last case, very properly expresses a general reluctance to the reception of such proof in cases where it has not heretofore been applied. He finally rejected it, because it worked a contradiction of the written agreement. *Turney* v. *Wilson*, 7 Yerg. 340, S. P. But see *Cherry* v. *Holly*, 14 Wendell, 26, and *Barber* v. *Brace*, 3 Conn. R. 9. Also *Lawrence* v. *M'Gregor*, 1 Wright, 193.

Nor have we any offer or intimation by counsel that they intended to go beyond the depositions in order to establish that the loss was by the act of God. The depositions are left to speak for themselves ; and from them alone can we judge whether they were admissible. The utmost they show in respect to *natural causes*, are a considerable wind, at the close of navigation, and the darkness of the evening heightened by a fall of snow. Under these circumstances an attempt was made to enter the harbor in a narrow channel, for the master's safe conduct through which he knew

that he depended on following a certain track by ranging with the beacon lights at the two light houses. On reaching the point where this range was to be taken, it so happened that the usual blaze at one of the light houses was for some cause not visible ; and a light in the *North America*, a steamboat which lay grounded in consequence of a previous storm, was easily mistaken for that of the farther house, whose light was invisible. Of the disaster to the North America, the defendant's master could probably have learned nothing, and could not, therefore, have been prepared to suspect the delusion. Indeed, the two experienced seamen who made the depositions in question concur to prove that the circumstances were such as to baffle the skill and care of an accomplished master accustomed to sailing this water ; and the jettison of the oysters, being necessary for the safety of the boat, was lawful, if the stranding arose from a justifiable cause. Story on Bailm. 336, 7, 8, § 525, 527. Id. 339, 40, § 530, 531, and the cases there cited. And see *Lenox* v. *United States Ins. Co.*, 3 Johns. Cas. 178, and *Smith* v. *Wright*, 1 Caines' R. 43.

The object of the depositions then was to excuse the loss by a mistaken deviation to which the master was led by a concourse of circumstances over which he had no control ; and they strongly tended to free him from all charge of neglect. So far they were material, if the loss had depended wholly on natural causes; for the least degree of negligence would, notwithstanding, make the carrier liable. Story on Bailm. 332 to 334, § 516, 17. *Williams* v. *Grant*, 1 Conn. R. 487.

But looking at all the grounds on which the depositions place the mistake, there is, I apprehend, an insurmountable difficulty, in saying that there was not such an admixture of human means as must vitiate the defence. It is insisted that the defendant's vessel was at a proper point of observation, yet no blaze at one of the light houses was to be seen, and the delusive light in the North America was mistaken as one by which to steer. The absence of the first was probably owing to neglect, and the latter must have been lighted and kept burning by a person about the boat

to which it belonged. This contributed as much towards the mistaken deviation by which the defendant's vessel was stranded, as the absence of the usual signal at the light house. I have sought in vain for any case to excuse the loss of the carrier, where it arises from human action or neglect, or any combination of such action or neglect, except force exerted by a public enemy. No matter what degree of prudence may be exercised by the carrier and his servants; although the delusion by which it is baffled or the force by which it is overcome be inevitable, yet if it be the result of human means, the carrier is responsible. A stronger case cannot be put than the common one, plunder by a band of robbers or rioters. Take the case of the riot of 1780, in which Lord Mansfield's house was destroyed, and a considerable military force could not prevent extensive and indiscriminate destruction in the city of London. Lord Mansfield has himself, in 1 T. R. 34, put even this as an instance which could not be received to protect a common carrier. With regard to such a change of circumstances unknown to the defendant, by which he or his servants are led into unavoidable mistake, the leading case is that of *Smith* v. *Shepherd*, Abb. on Shipp. part 3, ch. 4, § 1. The loss in that case happened at the entrance of the harbor of *Hull*. Just before the defendant's vessel had reached the place, a bank there, formerly shelving, had been rendered precipitous by a great flood, where a vessel sunk by getting on the bank, having a floating mast tied to her. The defendant's vessel striking the mast, was forced towards the bank, where, owing to change in the bank occasioned by the flood, the loss happened. The natural cause, the act of God in changing the bank, was laid out of question, as not being the immediate cause, and therefore furnishing no excuse. The fastening of the mast, if not the sinking of the ship to which it was attached, were the only remaining causes, and one, if not both, were obstructions placed there by human agency. Evidence was offered to show that there had been no actual negligence on the side of the defendant; but it was overruled at the circuit, and a verdict found for the plaintiffs, which was sustained by the court. This cause was tried in 1795 and was but following out a previous case, tried ten years

McArthur v. Sears.

before, that of the proprietors of the *Trent Navigation* v. *Wood*, 3 Esp. R. 127. The latter case, though given by a *nisi prius* reporter, was, like the former, considered by the king's bench. The defendant's vessel sunk by driving against a concealed anchor in the river, which belonged to a barge lying near ; but the bargeman did not, as he should have done, place a buoy to apprize others where his anchor lay. Cowper, of counsel, made a point that the defendant could not excuse himself on the conduct or neglect of another, the bargeman. Lord *Mansfield*, said " The act of God is a natural necessity, and inevitably such, as winds, storms, &c. The case of robbery, is certainly very strong ; but not a natural necessity, and in this case there is an injury by a private man, within the reason of the instance of robbery, yet I think the carrier ought to be liable." Ashurst, J. said, " If this sort of negligence were to excuse the carrier, when he finds that an accident has happened to goods from the misconduct of a third person, he would give himself no farther trouble about the recovery of them." Buller, J. said there was a legal negligence, though there might be none in fact. All three of the judges also intimated that there was some slight actual negligence in the defendant, which renders the case of somewhat less force for the point to which I have cited it. In *Forward* v. *Pittard*, 1 T. R. 27, a fire broke out 100 yards from the carrier's booth, where he had placed the goods for safe custody before he started. It burnt with inextinguishable violence, and reaching the booth, consumed the goods. All this was without any actual negligence of the defendant, and was not occasioned by lightning. Lord Mansfield said, the carrier is liable beyond his contract. He is in the nature of an *insurer* against every event except the act of God, &c. " Now what is the act of God ? I consider it to mean something in opposition to the act of man." He adds, that the law presumes against a carrier, until he shows that the loss arose from such an act as " could not happen by the intervention of man, as storms, lightning and tempests. In this case it does not appear but that the fire arose from the act of some man or other. It certainly did arise from some act of

man ; for it is expressly stated not to have happened by light-
ning.   The carrier, therefore, in this case, is liable, inasmuch
as he is liable for *inevitable accident.*" It seems by these
cases, that the words *inevitable accident,* which are preferred
by some to "act of God," because more reverent, are not ad-
equate to express the ground of a common carrier's excuse ;
for accidents arising from human force or fraud, are some-
times inevitable.   I believe it is a matter of history that in-
habitants of remote coasts accustomed to plunder wrecked
vessels, have sometimes resorted to the expedient of luring
benighted mariners by false lights to a rocky shore.   Even
such a harrowing combination of fraud and robbery would
form no excuse.   On the authority of *Forward* v. *Pittard,*
Lord Tenterden lays down the rule thus : "The expression,
*act of God,* denotes natural accidents, such as lightning,
earthquake and tempest ; and not accidents arising from the
fault or negligence of man." And see Story on Bailment,
330, § 511 ; Jeremy's Law of Carriers, 56.   To the cases al-
ready cited, may be added *Campbell* v. *Morse,* 1 Harp. Law
Rep. 468 ; *Harpell* v. *Owens,* 1 Dev. & Beat. 273 ; Kent,
Ch. J. in *Elliott* v. *Rossell,* 10 Johns. R. 11 ; *Robertson* v.
*Kennedy,* 2 Dana, 430 ; Green, J. in *Gordon* v. *Buchanan,*
5 Yerg. 82 ; *Turney* v. *Wilson,* 7 id. 340.   A man hires his
vessel to be repaired by a skilful workman, who makes a rud-
der apparently sound, but internally rotten, and the loss hap-
pens by reason of its breaking.   The owner is liable, though
he was ignorant of the defect.   *Backhouse* v. *Sneed,* 1
Murph. 173.

The farthest that any of the cases appear to go in favor of
the carrier is to excuse him where the loss happens by his
vessel being forced by the wind, or other natural and inevi-
table cause, against some permanent artificial object, as the
pier of a bridge erected by another.   *Amies* v. *Stevens,* 1 Str.
128, cited and approved by Spencer, J. in *Colt* v. *M'Mechen,*
6 Johns. R. 165.

There is a considerable class of cases arising upon excep-
tions in bills of lading, of the " perils of the sea," where, in
addition to losses from *natural causes,* those arising from the
acts of third persons are sometimes allowed to come within

the terms. Such are losses by robbery of pirates, *Pickering* v. *Barkley*, Sty. 132, 2 Roll. Abr. 248, *Buller* v. *Fisher*, Abb. on Ship. pt. 3, ch. 4, § 2, and the collision of ships without fault of either party. Story on Bailm. 332, § 514, and cases there cited. But these words are evidently of broader compass than the words " act of God ;" and although it was supposed by a very learned judge that they were but commensurate, Gould J. in *Williams* v. *Grant*, 1 Conn. R. 487, 492, and therefore whatever was a peril of the sea would excuse the carrier acting under his general liability, yet it is evident from the cases we have considered, that they are not always so. The distinction was adverted to, but not much examined by Story, J. in *The Schooner Reeside*, 2 Sumn. 571. The case of *Aymar* v. *Astor*, 6 Cowen, 266, was an action on a bill of lading, excepting the *dangers of the seas*. The goods were damaged on the voyage by rats; and it was held that the defendants having taken every precaution to avoid their depredations, the loss was by a *danger of the sea* within the policy. This case, we noticed before, has been treated as tending to upset the law extending the implied liability of common carriers to the water. Story on Bailm. 323, § 497. 2 Kent's Comm. 472, 3, 1st ed. Id. 608, 3d ed. *Crosby* v. *Fitch*, 12 Conn. R. 419. The case itself has no such tendency. There are in the case *dicta* of the chief justice, which, not being at the moment and in terms confined to the case as it stood on the exception in the bill of lading, were left open to the construction which has been put upon them by the learned commentators and by the case cited. My own marginal note of the case, I observe, runs into the same error. Cases as to the meaning of the words *perils of the sea* often arise also upon policies of insurance. See 1 Phil. on Ins. 249, 50, and 2 id. 191. For instance, it was held that the loss of a ship by the sudden impressment of sailors sent on shore to fasten it, was a loss within the policy. *Hodgson* v. *Malcolm*, 5 Bos. & Pul. 336. Yet it seems clear, on the cases, that such an act could not be received to exempt a common carrier either as the act of God or the enemies of the state. It may be irresistible. So we have seen of many acts merely human ;

still they may be collusively committed. The carrier may collude with a press-gang as well as with robbers or illegal kidnappers. The difficulty returns, therefore ; if we receive the immediate agency of third persons in any shape, we open that very door for collusion which has denied an excuse by reason of theft, robbery and fire. *Marsh* ads. *Blyth,* 1 Nott & M'Cord, 170, which held it a defence that the carrier's vessel was, without his fault, run down by another, is an instance in which the rule in respect to the special exception in a bill of lading has been applied to the carrier's general liability. There may be other cases of the like character, but it seems clearly to me, from authorities I have been able to consult, that the expression *perils* or *dangers of the sea,* or *dangers of the river,* &c., will be found to allow, in several cases, human agency and other causes to excuse a loss, which cannot be allowed in favor of common carriers, without giving up the rigorous obligation imposed upon them by the policy of the law. See also Story on Bailm. 330, 1, 2, § 512 to 514. 2 Kent's Comm. 3d ed. 599, 600, 607, 8. 3 id. 215, 217, and the cases cited by those authors, especially *Butler* v. *Fisher,* 3 Esp. R. 67. 1 Phil. on Ins. 250, 1. 2 id. 191. On the other hand, in *Lawrence* v. *M'Gregor,* 1 Wright, 193, 197, Wright J. at nisi prius charged that by whatever degree of negligence another boat might run down the carriers, this formed no excuse. *Gordon* v. *Buchanan,* 5 Yerg. 71, and *Turney* v. *Wilson,* 7 id. 340, take the distinction. In the former, Green, J. said, "the exception in this bill of lading of *the dangers of the river,* *which are unavoidable,* narrows down the liability of the owner of the boat. Many of the disasters which would not come within the definition of the act of God, would fall within the exception ; such, for instance, as losses occasioned by hidden obstructions in the river newly placed there, and of a character that human skill and foresight could not have discovered and avoided." This was repeated and adjudged in *Turney* v. *Wilson.* And see *Johnson* v. *Friar,* 4 Yerg. 48, and *Craig* v. *Childress,* Peck, 270. Mr. Justice Story seems to suppose that if an obstruction be secretly sunk in the stream, and not being known to the carrier, his boat

McArthur v. Sears.

founder, he would be excused. Story on Bailm. 334, 335, §
518. But the cases do not appear to sustain him, unless the
obstruction were sunk by the act of God, as by a sudden
and extraordinary flood. This may change the position of
the shore, raise a sand bar, or sink obstructions unknown to
the approaching navigator. If it arise from ordinary causes,
it would be otherwise, for the carrier undertakes against
these. Should a navigator, by mistake, run against a snag
in a river where such obstructions are known to abound, as
in the river Hatchie, see 4 Yerg. 49, whatever might be his
care, he would not be excused without an exception in the
bill of lading of *dangers of the river*. This, I think, is clearly
collectable from the cases already cited, of *Johnson* v. *Friar*
and *Gordon* v. *Buchanan*.

In the case at bar there was no exception in the bill of
lading. Of course, there is no room to contend that though
the loss may not have happened from natural causes inca-
pable of being foreseen, yet it was by a peril of the lake.
The defendant stands chargeable as common carrier with-
out qualification. The depositions setting up the fact that
the mistaken deviation on entering the harbor arose from
the act or negligence of some person, was equivalent to an
offer by counsel to prove it, with the additional fact that the
defendant's servants who managed the vessel were without
fault. This, which we have seen would have been material,
had the real cause of loss proposed to be shown, been such
as would in law exculpate a common carrier, was neutral-
ized by the want of such a proposition; indeed by the asser-
tion of a cause which could have no such effect. The
judge at the circuit, therefore, took substantially the same
course as was done in *Smith* v. *Shepherd*, before cited.
Evidence of the utmost care ceased to be relevant, so soon
as it was seen that the loss was not caused by the act of
God. The depositions could not with propriety be submit-
ted to the jury to prove a case which on its face was una-
vailable.

My opinion is, therefore, that a new trial must be denied.

New trial denied.