TOMPKINS (ANDERSON v.). See Case No. 365.

## Case No. 14,087a.
### TOMPKINS v. The DUTCHESS OF ULSTER.[1]

District Court, S. D. New York. Jan. 31, 1851.

CARRIERS—ACT OF GOD—PERILS OF NAVIGATION—CARRIERS BY WATER—LOSS OF CARGO—USAGE.

[1. A steamboat loaded in New York for Peekskill sank in a storm in the North river. The libelants, owners of the cargo, proved by the pilot that there was fault and negligence in the management and equipment of the boat, and particularly that the boilers leaked and extinguished the fires, thus disabling the engines from working; also, that an ash hole was left open below the deck. The claimants contended that the vessel and cargo were lost on account of the violence of the storm, and denied the allegations of negligence and improper equipment. Held, that the vessel was liable for loss of cargo.]

[2. The "act of God" which excuses a common carrier from liability must be the immediate and distinct result of providential events, sudden or overwhelming in their character, which human sagacity or force could not foresee or prevent.]

[3. The carrier by sea, unless limited by contract, is not exempt from liability on account of loss through the ordinary perils of navigation.]

[4. The common-law doctrine of carriers' liability by land is applicable in admiralty to carriers by water. There is no distinction between the two kinds of carriers.]

[5. The liability of the carrier may be limited by contract, but there is no usage by which goods received for transport on the North river, in New York. are at the risk of the shipper, as against the perils of the sea and dangers of navigation.]

The steamboat plied, as a freight and passenger boat, between New York and Peekskill, on the North river. The libelant [Aaron Tompkins] is a trader at the latter place. On the 26th of March, 1849, he loaded on board

---

[1] [Not previously reported.]

the boat goods and merchandise to be transported to Peekskill. The goods were never delivered to the libelant. No bill of lading was executed, or other express contract entered into, upon the subject. The defense is that the boat encountered a violent storm on her passage, against which she struggled until the 29th of the same month, when she was sunk by force of the storm, and the goods were thereby lost, and for that cause the boat is discharged of responsibility for their delivery. There was conflicting evidence as to the seaworthiness of the vessel, and her sufficiency for the navigation of the Hudson river between those places under such circumstances as may be expected to occur on the passages in the stormy periods of the year.

BETTS, District Judge. Steam vessels employed in the transportation of property for hire are common carriers, and subject to the legal liabilities of that class of bailees, unless their responsibility is limited by express contract. Abbott, 417, note 1; Story, Bailm. § 496, note 5; Ang. Carr. § 83, note; McArthur v. Sears, 21 Wend. 190; New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 381. In that capacity, they are only excusable for the loss of the property intrusted to them on proof made by them that the loss was occasioned by the act of God, or by public enemies. Ang. Carr. § 46, 148; Hollister v. Nowlen, 19 Wend. 238. The evidence offered by the claimants to show that the goods were lost in this case by the act of God is that on the night after the boat left New York a severe gale of wind blew from the northeast; that the boat got to the entrance of Tappan Bay, running up on the west shore, when it was found the wind was so violent that she could not make headway against it; that she attempted to cross the river to the east shore for a shelter, but was thrown into the trough of the sea, and had not power to extricate herself from that position where she rolled badly, nearly stopping the engine, and then had one end of her shaft thrown out of place so that she was obliged to anchor, and, the gale continuing, she rode at her anchor that night and the next day, and was sunk the succeeding night.

The libelant proved by the deposition of the pilot of the boat, and the declarations of her master made on two occasions soon after her loss, that the disaster was owing to the leakage of the boiler, which extinguished the fires, and disabled the engine from working. He also proved an ash hole was open below the deck, and two or three augur holes, prepared for discharge pipes, through which the water could readily enter, in the state of the weather, and position of the boat as anchored, sufficient to sink her. The master of the boat and engineer denied that the boiler leaked, on the passage in question, to the injury of the working of the machinery. The boiler was new, having made but one trip, and on that had leaked badly, but was made tight on this occasion. They also negatived the fact that the boat made water to any extent through the ash hole or the augur holes. There is, however, proof that the engineer took off his coat, and pressed it into the ash hole, to prevent water rushing in through that opening. The testimony as to the character of the gale or storm is not very precise or satisfactory. The wind was of such severity that the captain of the South America testified that, coming down from Albany with her,—she being a mail boat, and required to make fourteen landings with the mail,—he had only attempted to make three, and could not succeed in one at Kingston, and only landed at Coxsackie and Newburg, lying to at the wharf at the latter place till morning; that at Kingston the boat got into the trough of the sea, and experienced a good deal of difficulty in working herself out, and getting under way down the river. The Fairfield, coming down the river the same night, came to at Ray Hook, and did not deem it prudent to attempt coming through the bay. The next day (the night the boat sunk) the Fairfield left New York at 5 p. m., but, on account of the storm, made harbor at the Trinity Church Cemetery, and lay there till morning. The libelant proved that the ——, a propeller and boat of small power, compared with her bulk, left New York the same afternoon with the Dutchess of Ulster, and came up through the highlands to West Point without difficulty. She came to at the latter place for want of fuel. Other circumstances were in proof, on the one side and the other, for the purpose of showing the sufficiency or insufficiency of the boat, and her equipments and command, for the service she was engaged in; the libelant contending that there was fault and negligence in the equipment and management of the boat, and the claimant insisting she was well found and skillfully navigated.

In the aspect of the controversy, it might be important to examine particularly this branch of the case, because the rule of law seems explicitly settled that, when the loss is produced wholly by natural causes, still, if there be the least degree of negligence conducing to it, or it arises in any way from human actions or neglect, or any combination of such action or neglect, the carrier is not excused. McArthur v. Sears, 21 Wend. 190; Williams v. Grant, 1 Conn. 487.

I shall not lay great stress on this particular, because, in my judgment, the claimants have not succeeded in proving the loss occasioned by the "act of God," in that sense in which the phrase is employed in jurisprudence. It must always be exceedingly difficult to discriminate between natural events, or accidents which are necessarily operations of providential direction and superintendence, and those which fulfil the legal acceptation of "acts of God." The books supply

some criterion by which the distinction may be marked, yet there is no authoritative definition laid down which fixes with certainty when the disaster is to be classed among events resulting directly from natural necessity, or is ascribable to those fortuitous causes which comprise what are called "perils of the sea," or belongs to the family of "inevitable accidents," produced by no sudden or overpowering necessity. The phrases are not unfrequently used as bearing the same import. New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 381; Jones, Bailm. 104, 105; Story, Bailm. §§ 25, 511. Yet usually the qualification attends them that the accident or necessity which excuses a carrier must be the immediate and distinct result of providential events, sudden or overwhelming in their character, which human sagacity or force could not foresee or prevent. Forward v. Pittard, 1 Durn. & E. [1 Term R.] 33; 3 Kent, Comm. (6th Ed.) 217. The illustrations Chancellor Kent gives as the summary of the doctrine on this subject are that the carrier is responsible unless the loss has happened by means of lightning, earthquake, or tempest. 3 Kent, Comm. 217.

Putting this case, then, in its aspect most favorable to the carrier, and considering it proved that the vessel sunk by means of the storm under which she had been riding for two nights and a day, there would be great difficulty in bringing the loss within the principle which exempts him from liability because of a peril of extraordinary character and violence. The vessel did not founder. She was not strained and opened by the tempest so as to send a rush of water into her and cause her to sink suddenly or inevitably, notwitnstanding the efforts of her crew to relieve her. She was not disabled in her hull or machinery by the direct effects of the storm, in a manner to render her destruction inevitable, or even to peril her safety. Her engine was not disabled, nor the shaft of her wheel displaced, until after the fire in her was extinguished, and the evidence does not show that the water was driven in by the gale so as to disturb the fire. Upon this branch of the case, the just conclusion from the proofs, in my judgment, is that the boat was compelled to anchor from the extinction of her fires, solely. There was nothing in the severity of the storm which prevented her being manageable, with the use of her machinery, and to maintain, as she had for an hour or two previously, headway against it. If she had not sufficient power to work across the river to the eastern shore, there is no satisfactory evidence that the boat might not, with the use of ordinary skill, have been brought about on the western shore, and then run safely before the wind to a harbor below the bay. The act of God which excuses a common carrier for the loss of goods must be the immediate, and not the remote, cause of the loss. King v. Shepherd [Case No. 7,804].

It is manifest that the supreme court of this state, and the court of errors, hold common carriers by water, standing as insurers, to be liable for losses occasioned by perils of navigation of a very immediate character, unless those dangers are excepted in their contracts of transportation. The owners of a vessel capsized by a sudden squall of wind on Lake Ontario were held excused for the loss of cargo occasioned thereby because the dangers of the lake were excepted from their responsibility, and the defendants had proved they used ordinary skill and prudence in the navigation. Fairchild v. Slocum, 19 Wend. 329; s. c., in error, 7 Hill, 292. The accident was ranged in the list of dangers of the lake, or perils of navigation, and not considered the act of God. So, also, loss of cargo occasioned by the rolling of the vessel in a cross sea is not ascribable to the act of God, but is an ordinary peril of the sea. The Reeside [Case No. 11,657].

Upon the supposition of the claimants that the boat sunk by reason of the calking wearing out of her seams, from her long straining at her anchor and occasionally touching ground, the storm would be the remote, and not the direct and immediate, cause of the loss. This is not proved to have been the cause of the boat's sinking, and, had it been, was not sufficient in law to exempt the carrier from his liability. The Columbus [Case No. 3,043]. I cannot discover in the proofs any reason for regarding this storm the steamboat encountered on the occasion more than a peril of navigation on the seas, which the carrier by water is bound to bear, unless he exempts himself by his special undertaking. 19 Wend. 329; 7 Hill, 292. The wind was high, and of long duration; but it had not the character of a sudden squall or whirlwind, or anything more than the boisterous and tempestuous weather ordinarily encountered in voyages at sea, on the lakes, or broad rivers and bays.

The position contended for on the argument by the counsel for the claimants, that the common-law doctrine applicable to common carriers is no part of the maritime law, is supported by no authority. These cases, throughout, show that carriers at sea, or by inland navigation, are subjected to one and the same responsibility with those by land, when there is no qualification of it by a special undertaking. 2 Kent, Comm. (6th Ed.) 608; Story, Bailm. § 508; Ang. Carr. §§ 80, 83, and notes. In Elliott v. Rossell, 10 Johns. 1, the supreme court say there is no distinction between a carrier by land and a carrier by water. Master and owners of vessels are liable, as common carriers, on the high seas as well as in port. The counsel in that case endeavored to establish a distinction between the responsibility of the carrier for carriage of goods within the jurisdiction of the court, and when the transportation was beyond the jurisdiction and out of the reach, but the court held the rule to be universal. The doc-

trine was explicitly repeated, and applied to steam vessels on the North river. Allen v. Sewall, 2 Wend. 327. That decision was reversed, upon a special feature of the case, by the court of errors, but the principle of the liability of carriers, and that the owners of the boat were such, was approved by the court. Sewall v. Allen, 6 Wend. 335. The disaster the boat met on this voyage would very properly fall within the denomination of a "peril of the seas," or a "danger of navigation," and I do not perceive justifiable grounds for giving it any higher character. The claimants contend that every contract for transportation of goods by vessels upon the North river, implies this exemption, and that it need not be expressed in terms, or reserved by a bill of lading. There is no usage proved that goods are delivered or received for transportation on any such understanding. The cases in the State Reports import the contrary. If a usage or custom of that character is relied upon as a defense, it is incumbent on the claimants to prove it clearly.

The court cannot recognize as matter of law that this obligation of the carrier by river navigation is limited to losses happening otherwise than by such perils as amount to the "act of God," in its legal acceptation. It has been already sufficiently indicated that the law recognizes a distinction between dangers called "perils of the sea" and those falling within the meaning of the "act of God," in respect to the liability of carriers. If, however, the counsel for the claimants could have succeeded in showing they were of the same import, the proofs in the case establish against the claimants the want of proper care and precaution in the fitment of the steamboat, and her management on the voyage. The weight of evidence is that the boiler leaked so badly as to prevent their maintaining a fire to propel the boat. It is also proved that holes were left open in her sides, through which water entered from the rough and high sea on at the time, and the presumption that those particulars contributed to her loss is not rebutted by proofs on the part of the claimants. They call no witnesses to prove, from the condition of the hull after the boat was raised, that she sunk from any other causes. The boat was so anchored in the gale as to expose the side in which these holes were towards the wind, to her greatest disadvantage. She was not supplied with any small boat, by which, in any emergency, the cargo could have been saved, or assistance brought to the vessel; and she was left lying at her anchor, quartering to the wind, when, by reasonable nautical skill and exertion, she might have been brought with her head directly to the wind, or put about to run before it. The captain had no experience as a navigator, nor was the person in charge of the engine an engineer regularly trained and accustomed to working engines. These various particulars

are evidence of that want of due precaution which is always exacted of common carriers, and the omission of which render them chargeable for losses, although, by their agreement, exempted from responsibility for mere perils of the sea or navigation.

Upon the whole case, the libelant, in my judgment, is entitled to recover the value of his property placed on board this boat and not delivered to him, and the boat is condemned therefor, with costs. It must be referred to a commissioner to ascertain the value of the property. Interest at the rate of six per cent. will be allowed on the value from the time of loss. Decree accordingly.