Wright, J.
There was no controversy as to the nature of the accident, or how it occurred, which caused the loss of the plaintiff’s horses. On the Friday preceding the downward trip of the defendant’s steamer a sloop had been sunk, in a squall of wind, near Buttermilk Falls, and about in the usual route on the downward passage of steamboats navigating the river. The defendant’s steamer ran upon the mast of this sunken vessel, which stove in her bottom, and she was cast away, and sunk in the water to her promenade deck in consequence. The defendant assumed this to be an inevitable accident, against which he could not have guarded by the exercise of due diligence and precaution; and, as matter of law, that it excused him from liability as a carrier. This presents one of the two questions raised by the exceptions in the case.
The law adjudges the carrier responsible, irrespective of any question of negligence or fault on his part, if the loss does not occur by the act of God or the public enemies. With these exceptions, the carrier is an insurer against all losses. The expressions “act of God” and “inevitable accident” have sometimes been used in a similar sense, and as equivalent terms. But there is a distinction. That may be an “ inevitable accident” which no foresight or precaution of the carrier could prevent; but the phrase “act of God” denotes natural accidents that could not happen by the intervention of man—as storms, lightning, and tempest. The expression excludes all human agency. In the case of the Trent Proprietors v. Wood (4 Douglass, 287), Lord Mansfield said: . “ The general principle is clear. The act of God is natural necessity—as winds and storms—which arise from natural causes, and is distinct from inevitable *118 accident.” The same judge, in Forward v. Pittard (1 Term Rep. 27), defined the “act of God” to be something in opposition to the act of man—adding “ that the law presumes against the carrier, unless he shows it was done by such an act as could not happen by the intervention of man— as storms, lightning, and tempest.”
Another principle running through the case is, that to excuse the carrier the act of God must be the sole and immediate cause of the loss. That it is the remote cause is not enough. This is illustrated in the case of Smith v. Shepherd reported in Abbot on Shipping (part 3, ch. 4, § 1); and McArthur v. Sears (21 Wend. 190). In neither of the cases was the loss occasioned directly by natural violence, although a sudden and extraordinary flood in the one case, and a light on board a steamer which had grounded in a previous gale of wind in the other, were the remote causes. In Smith v. Shepherd, the vessel was lost by striking a floating mast attached to a vessel which had been sunk by getting on a bank that had suddenly and unexpectedly been made dangerous by an extraordinary flood. Coming in contact with the mast attached to the sunken ship, the defendant’s vessel was forced by it upon the bank, altered suddenly by the flood, and was wrecked. The flood which changed the bank was the ultimate occasion of the misfortune; but it was held to be too remote. The vessel had not been forced on the bank by winds or other extraordinary violence of nature, or without human interference. The immediate cause of the loss was the coming in collision with a floating mast which some person had attached to the sunken vessel. In McArthur v. Sears, the vessel was lost in attempting to enter port by mistaking a light on board of a steamer which had grounded in a previous gale of wind for one of two beacon lights of the port. One of the beacon lights, through some neglect, was not burning, and the light on board of the wrecked steamer was easily-mistaken for it. It was a dark night, the snow was falling, *119 and there was a considerable wind. The mistake occasioned the loss of the vessel without any fault of her master or crew, yet it was held that the carrier was not excused.
In the present case the sinking of the defendant’s vessel was not directly caused by the act of God. The immediate cause was her running upon the mast of a sloop that had been sunk in a squall of wind á day or two previously. She was not forced upon the mast which stove in her bottom by the wind or current, and although the sloop may have been sunk by the violence of the wind, yet that was but the remote cause of the loss of the defendant’s steamer. The case of Smith v. Shepherd, in its circumstances, closely resembles the present one. In that case the defendant’s vessel ran against a floating mast attached to a vessel which had been sunk by getting on a bank suddenly changed and made dangerous by a flood, and was forced by the mast upon the changed bank and wrecked, . In this case the defendant’s vessel ran against the mast of a sloop that had been sunk in a sudden and violent squall of wind. In the former case, the changing of the bank was the “act of God,” as spoken of in the law of carriers. So in this case the sinking of the sloop was occasioned by what may be properly called the “ act of God.” But neither the changing of the bank by the flood, nor the sinking of the sloop by the sudden and violent squall, was alone the cause -of the loss of the defendant’s vessel. Human agency intervened in the one case, by attaching to the sunken vessel the floating mast with which the lost vessel came in contact; and in this other, by placing the sloop in the position in which she was overtaken by the wind. All the cases agree that by the expression “ act of God,” is meant something which operates without any aid or interference from man; and when the loss is occasioned, or is the result in any degree of human aid or interference, the case does not fall within the exception to the carrier’s liability. I am of the opinion, therefore, that had the defendant shown that the plaintiff’s loss was occa *120 sionecl by an accident, against which he could not have guarded by the exercise of due diligence and precaution, it would not have absolved him from his responsibility as a carrier.
The horses were put on board the defendant’s steamer for transportation, on Sunday, the freight paid and a receipt taken. The defendant’s second point was that he was discharged from liability on the ground that the contract to carry the horses was in violation of the statute respecting the observance of Sunday. (1 R S. 575, 676.) There is no force in the suggestion. Even if the contract were for the'performance of servile labor, there was nothing in it which required the defendant to transport or commence the transportation oni Sunday; and notwithstanding, the horses were taken on board'on Sunday, he was at liberty to detain the vessel at her dock until Monday morning. A contract made on Sunday is not void, and to invalidate a transaction under the statute, the contract must necessarily require the act to be performed on Sunday. (Boynton v. Page, 13 Wend. 425; Watts v. Van Ness, 1 Hill, 76.) However, if it was expected that the transaction was to begin on Sunday, it was not to be completed until Monday. But it is not material whether the contract made was good or bad: it was enough to entitle the plaintiff to recover, that the defendant being a common carrier, had in his custody for transportation the plaintiff’s property, and by his negligence or in violation of duty, it was lost. This gave the plaintiff a right of action, wholly disconnected from the statute relating to the observance of Sunday. (Allen v. Sewall, 2 Wend. 338.) The judgment of the supreme court should be affirmed.
Johnson, J.
There is nothing in the facts of this case which could excuse the defendant from liability for the loss as a common carrier. The immediate cause of the accident and loss was the contact of the defendant’s vessel with the *121 obstruction, in the river. This obstruction was the mast of a sloop which had sunk in a squall two days previous. It was out of water fifteen or sixteen feet at low water, and was visible the preceding Saturday and Sunday. This was not an inevitable accident within the meaning of the term, as used in law. It might have been avoided. The squall which sunk the sloop was not the immediate proximate cause of this accident, though it may have been that of sinking the sloop. It was but the remote or secondary cause of the accident in question, and affords no shield to the defendant. (Edwards on Bailm. 455, 456; Story on Bailm., § 517; McArthur v. Sears, 21 Wend. 190.)
The fact that the contract was made and the property delivered on board the vessel on Sunday does not exempt the defendant from liability for the loss of the property. The loss did not happen on Sunday, and it was not within the contemplation of the parties when making the contract, that it would or could be wholly performed on that day. As a contract, I do not think it comes within the purview of the statute. It was not strictly a contract for servile labor, although labor of that kind would necessarily be employed, to-some extent, in its performance by the defendant. But even if it was, the contract was only to be entered upon on that day, and completed the next day in the usual course of the business of the defendant’s vessel. The statute only prohibits servile working and laboring on that day, and can be construed to avoid such contracts only as are for work or labor of that description, to be wholly performed on that day. ■ Hence it has been held that a contract made on Sunday to work for a year was good, and not within the statute; (The King v. The Inhabitants of Whitnash, 7 B. & C. 596); and in Sandiman v. Breach (7 id. 100), it was held that the statute did not include the driver and owner of a stage-coach, and that the plaintiff might recover damages of the owner of the coach for not trans- , porting him on Sunday in pursuance of a contract to be *122 executed on that day; inasmuch as the statute did not make it illegal for stage-coaches to travel on that day. The statute does not prohibit the transportation of property on the Sabbath, either by land or by water, and therefore a contract made for the transportation of property on that day would not come within the prohibition. At common law the observance of the Sabbath was a duty of imperfect obligation. (Rex v. Brotherton, 2 Str. 702.) Any private business may be lawfully done which the statute does not prohibit, and all contracts relating thereto are valid. (Boynton v. Paige, 13 Wend. 425.) It was held in Harrison v. Marshall (4 E. D. Smith, 271), that in an action for an injury to a thing hired, it was no defence that it was hired on Sunday. In Massachusetts it has been held that a promissory note made on Sunday is good (Geer v. Putnam, 10 Mass. 311.)
But even if the contract was so far void that it could not be enforced as an executory contract, it would constitute no defence to this action. The liability of a common carrier does not rest in his contract, but is a liability imposed -by law. It exists, independently of the contract, having its foundation in the policy of the law, and it is upon this legal obligation that he is charged as carrier for the loss of property entrusted to him. (Edwards on Bailm. 466; Hollister v. Nowlen, 19 Wend. 239; Ansell v. Waterhouse, 1 Chitty R. 1.)
It is- clear, in any viéw of the case, that the defendant became, and was, the common carrier of this property, and of course all the duties and liabilities pertaining to that character attached to him in reference to such property. He is therefore liable for the loss, even if the contract in other respects could not be enforced by reason of the day on which it was made, which I do not think is the case. It would scarcely do to hold a common carrier exempt from the ordinary liability, because it was understood between the parties at the time of the undertaking that *123 the property for some portion of the time and distance was to be transported on the Sabbath. That would be extending the statute for the observance of Sunday far beyond its object and intention. I am of the opinion, therefore, that the judgment was right, and should be affirmed.
All the judges concurring, judgment affirmed.