ADDISON GAGE & anotner *vs.* MINOT TIRRELL & others.[*]

If the owners of a vessel, which is employed in the transportation of merchandise generally enter into a contract of affreightment for the carriage of goods, for a certain price, without inserting therein any special clause enlarging or limiting their liability, and afterwards, in order to furnish the usual shipping documents for transmission, in the usual course of business in shipping transactions, and without any new consideration, sign bills of lading providing for the delivery thereof, "the dangers of the seas only excepted," the insertion of this exception in the bills of lading does not enlarge their liability, so as to make them responsible to the shipper for a loss arising from the act of public enemies.

CONTRACT. The declaration alleged that the plaintiffs put on board of the ship Aboelino, then lying in Boston, of which the defendants were owners, eight hundred and fifty tons of ice, under a bill of lading, a copy of which was annexed ; and that the defendants did not deliver the ice according to the terms thereof. The bill of lading was dated April 8th 1861, and, after reciting that the ship was bound for New Orleans, provided as follows : " That the hold of the vessel where the ice is placed shall not be opened or exposed to the air, unless by stress of weather or wants of the vessel, in which case due protest shall be made, and an account kept of all ice thrown overboard in case of jettison ; that the vessel shall be regularly pumped out during the passage, so that the ice or fitting materials may not be unnecessarily wasted ; that no fish, meat or other article shall be placed in or with the ice, without the consent of the shipper; which is to be delivered in like good order and condition, (excepting what may be lost by the natural waste of the article,) at the aforesaid port of New Orleans, (the dangers of the seas only excepted,) unto Messrs. A. W. Bosworth & Co., or to their assigns, he or they paying freight for said ice, five dollars a ton, with average accustomed."

It was agreed, in this court, that on the 19th of March 1861 the plaintiffs and the defendants made the following agreement: " Memorandum. Agreement made this nineteenth day of March 1861, between Addison Gage & Co. and the owners of the ship

---

[*] In this case, which was argued in March 1864, HOAR, J. did not sit.

Abœlino of Boston. Addison Gage & Co. hereby agree to load the said ship at East Boston or Charlestown with a full cargo of ice for New Orleans; say, to fill the lower hold, and to load as much in the between decks as the owners of the ship require; but give the owners the privilege, at their option, to load other goods in the between decks instead of ice. Addison Gage & Co. hereby agree to pay at the rate of five dollars per ton on the quantity of ice shipped, payable in cash on the delivery of the cargo of ice at New Orleans, and to load and unload the ice and fixings. If other merchandise than ice is to be loaded in the between decks, it shall not detain the ship over four days. The owners of said ship hereby agree to the above price and conditions." Pursuant to this contract, the ice was shipped, and on the 8th of April 1861, the agents of the owners of the vessel, at the request of the plaintiffs, in order to furnish them with the usual shipping documents for transmission, and without any new consideration whatever, in the usual course of business in shipping transactions, signed three bills of lading of the same tenor, a copy of the material parts of one of which is given above.

The defendants, pursuant to the right reserved to them in the contract of March 19th, agreed to take on freight, deliverable in New Orleans, other merchandise, which was to be loaded in the between decks of the ship; but the same did not arrive in Boston in season to be shipped.

The Abœlino proceeded on her voyage, and arrived at the mouth of the Mississippi River on the 17th of May 1861, and the next day she with her cargo was seized and forcibly taken possession of by the officers and crew of an armed vessel belonging to the so-called Confederate States, the captain of which exhibited a commission signed by Jefferson Davis, claiming to be president of said Confederate States, and was disposed of, under the circumstances and in the manner stated in the case of *Tirrell* v. *Gage*, 4 Allen, 245.

The case was reserved for the determination of the whole court.

*J. G. Abbott*, for the plaintiffs. The bill of lading is an

express written contract between the parties, carefully defining the obligations and liabilities of the defendants, and leaving no room for implication of other duties, obligations or exceptions. This was a legal and competent agreement for the defendants to make. *Paradine* v. *Jane,* Aleyn, 26. Even if the defend- ants were common carriers, there is nothing to prevent them from making an express contract by which their rights shall be determined. *Wareham Bank* v. *Burt,* 5 Allen, 113. It is only in those cases where there is no express contract, but where the law implies an obligation from the acts of the parties, that excep· tions are implied; but where the parties make an express con- tract, no exceptions are implied. *Hadley* v. *Clarke,* 8 T. R. 239. *Atkinson* v. *Ritchie,* 10 East, 530. *Liddard* v. *Lopes,* Ib. 526. *Spence* v. *Chadwick,* 10 Q. B. 517. *Scott* v. *Libby,* 2 Johns. 336. *Bever* v. *Tomlinson,* cited in Abbott on Shipping, (7th ed.) 386. The defendants did not choose to provide for the contingency which happened. The performance of their agreement did not become illegal, subsequently to its being made.

Even if this is to be taken as a contract with common car- riers, this loss was not through the act of pirates. Those who seized the defendants' vessel did not come out as enemies of the world, but under a claim of right.

*S. Bartlett & F. Bartlett,* for the defendants.

BIGELOW, C. J. The liability of the defendants in this action depends on the interpretation of the same contract of affreight- ment which was the subject of consideration by this court in *Tirrell* v. *Gage,* 4 Allen, 245. The present defendants there sought to hold the plaintiffs in this action liable as shippers for the full amount of the stipulated freight, on the ground that the contract had been fully performed by the transportation and delivery of the ice at the port of destination, in compliance with the terms of shipment. The present plaintiffs in their turn now seek to hold the defendants liable for the value of the ice shipped on board their vessel, on the ground of a breach of the contract by them, in not duly transporting and delivering the ice to the consignees, whereby it was wholly lost to them. It is obvious that the questions raised in this case are not necessarily identical

with those which were heretofore considered. A carrier may not be entitled to compensation by reason of a failure to fulfil his contract, and yet not be chargeable for the value of the property intrusted to his care. If, for example, he is prevented from transporting and delivering goods by the act of God or the public enemy, he may not be able to recover the stipulated price for their carriage ; nor, on the other hand, could he be held liable for their value, unless by the terms of his contract he had assumed an extraordinary responsibility.

In determining the question of the liability of the defendants in this action, it is important to bear in mind the precise nature of the relation which the contract of affreightment created between the parties. The facts agreed leave no room for doubt on this point. It is not a case where a whole ship was chartered to certain persons for a voyage, or where goods were received for the plaintiffs only, the residue of the ship being used by the defendants for their own private purposes. But it appears that a part of the ship only was to be taken up by the cargo belonging to the plaintiffs, and that other persons were to ship merchandise on board, which was to be carried to and delivered at New Orleans. The ship was therefore a general ship ; that is, she was employed in the transportation of merchandise for persons generally. This fact is decisive of the character of the contract into which the parties entered, and of the nature of the liability which the defendants assumed under it. They were common carriers. As such they assumed all risks of loss of the property shipped on board their vessel, except those arising from the act of God and public enemies, unless it shall appear, on examination of the contract of affreightment into which they entered, that they took upon themselves a different responsibility, greater or less, as shall be found to result from a just interpretation of its terms. Story on Bailments, §§ 446, 500. Abbott on Shipping, (7th ed.) 382–392.

If the rights of the parties are to be determined solely by the agreement or memorandum executed by them on the nineteenth day of March 1861, the point of contention between them would be susceptible of a ready solution. By this original contract of

shipment, the plaintiffs agreed to put on board the defendants' vessel, and into a designated part of her hold, a quantity of ice to be carried to New Orleans at a fixed rate of freight. There are some minor stipulations in the contract, but there are none concerning the nature or extent of the risk which the carriers were to assume in the transportation of the ice. On this point the contract is silent. The parties did not by any special stipulations enlarge or restrict the liability which would attach to the defendants in their capacity as common carriers. This was left to be regulated and governed by the ordinary rule of law, which by implication fastens on the carrier the liability of an insurer against all risks except those caused by inevitable accident or the public enemies. In this aspect of the case, if there is nothing else to vary or change the rights of the parties, the single question for our determination would be, whether the persons who seized the defendants' vessel and took possession of and carried away the ice by force can properly be regarded as coming within the definition of public enemies for whose acts common carriers are not responsible.

But it is urged by the plaintiffs' counsel that the contract of shipment originally entered into by the parties is not to be taken as the standard by which the liability of the defendants is to be measured; that this contract was virtually set aside and annulled by the bill of lading of the ice, which was given to the plaintiffs after the ice was put on board; that this constitutes an express written contract, by which the obligations and duties of the defendants are defined and are to be judicially determined; that by this they undertook to deliver the ice at New Orleans to the consignees, " the dangers of the seas only excepted; " that this express exception of a certain class of risks excludes all others, leaving no room for engrafting into the contract by implication of law the additional exception of the risks of loss by public enemies, if the seizure of the ice can be properly so designated. If this is a correct exposition of the rights and liabilities of the parties, then the case would present the single question whether the failure to deliver the cargo could be said to come within the express exception of the dangers of the seas.

We are not prepared to admit that a bill of lading constitutes the sole evidence of a contract of affreightment, by which all the rights and liabilities of the shipper and carriers are to be exclusively determined, when, as in the case at bar, there is a previously subsisting written agreement between them for the carriage of goods, and the bill of lading is delivered to the shipper without any new or additional consideration, in execution of the contract previously entered into. Such cannot be the rule, when a formal charter party is entered into. It would be unreasonable and contrary to the manifest intent of the parties to hold that the full and particular stipulations of the parties concerning the subject matter of the shipment and carriage of the goods are wholly superseded and controlled by the merely formal document, usually signed by the master of the vessel on receiving the goods on board in pursuance of the terms of the charter party. It has been suggested that a bill of lading made and delivered under such circumstances is rather to be regarded as a paper issued in the ordinary course of business, for the purpose of furnishing one of the usual shipping documents for transmission to the consignees, and to be used as a means of facilitating the delivery of the cargo to them on its arrival at the port of destination, and that it is not intended as evidence of the terms on which the shipment was made when a written contract of affreightment has been previously entered into. *Lamb* v. *Parkman*, Sprague's Decis. 343, 353. *Morrison* v. *Davis*, 20 Penn. State R. 117. Indeed, the actual intent of the parties to this action, if we rightly understand that part of the agreed statement of facts which relates to the execution and delivery of the bill of lading, was in conformity to this view of the usage among merchants and shipowners.

But we do not think it necessary to put the decision of the present case on the ground that the bill of lading is to be excluded in adjudicating on the rights of the parties. Starting with the assumption, most favorable to the plaintiffs, that the agreement of the 19th of March for the shipment of the ice, and the bill of lading subsequently signed on the delivery of the ice on board of the vessel, are to be taken as one contract, and that

full effect is to be given to the stipulations contained in both the papers, we are to determine, in the first place, whether the defendants are shut out from availing themselves of the exception to the liabilities of common carriers imposed by law for loss of goods intrusted to them caused by public enemies. If they are to be excluded from the benefit of this exception, it must be, as has been already said, on the ground that in the bill of lading they have inserted a special exception, exempting themselves from liability for losses happening by dangers of the sea, and cannot now excuse themselves for the non-performance of their contract by the happening of events which are not embraced within the terms of this exemption. In other words, the argument is that an express exception excludes all implied exceptions. The maxim *expressio unius est exclusio alterius* is a cardinal rule of exposition, of familiar application, founded in good sense and sound reason, and affording an appropriate method of arriving at the presumed intent of parties to deeds and instruments in which it is not fully expressed. But, as has been justly observed by a learned writer, great caution is requisite in applying the rule, lest it may be used for the purpose of defeating instead of subserving the real intent of parties. Broom's Max. (2d ed.) 506. There can be no doubt that where a party expressly covenants that he will do a certain act, he cannot qualify or restrict the covenant so as to excuse its non-performance by exceptions or limitations arising from implication only. In such cases, the inference is reasonable that if the parties did not mean that the covenant should be absolute, they would have expressed the limitation which they intended to put upon it. Thus, where there is a covenant to repair in a lease, no implied contract to make repairs can be raised ; nor can the performance of such a covenant be excused by the happening of events for which no provision was inserted. But the exclusion of all implications must be confined to the same class or kind of acts or stipulations as that to which the express agreement or covenant relates. It cannot be extended so as to embrace matters concerning which the parties have made no stipulations. In other words, it cannot be said that a party is deprived of the benefit of all

implied covenants in relation to the subject matter of a contract because he has entered into express stipulations concerning certain specific incidents or particulars connected with or growing out of the contract. For example, an express covenant in a lease by a tenant to repair, would in no way affect the implied covenant not to commit strip or waste on the premises. So an agreement in a charter party that the shipper should bear a loss which might arise from an inherent vice of the article shipped, would not exempt the carrier from liability for an injury resulting from the negligence of the master or sailors. The reason is, that in such cases the agreement expressed is not connected with and bears no necessary or direct relation to that which is implied, and hence no just inference can be drawn that the parties intended by inserting one stipulation to exclude all other implied obligations on distinct and independent matters. The only safe mode of applying the rule is to ascertain whether it can be fairly presumed, from that which is expressly stipulated, that the matter sought to be excluded was present to the minds of the parties when the agreement was entered into. The exclusion can reasonably extend no further than to shut out all implied agreements and stipulations of the same nature or relating to similar matters. Thus, if a party take an express warranty of an article from a vendor, it is reasonable to suppose that the subject matter of warranty was in his mind at the time of the sale, and that he caused to be inserted in the contract a promise concerning the nature and quality of the articles sufficiently comprehensive to include all on that subject which the parties intended should form part of the bargain. But if the contract contained no warranty at all, but consisted of stipulations on other matters, the warranty implied by law, if any, would still form part of the contract, and an action for a breach of it could be maintained. *Shepherd* v. *Pybus*, 4 Scott N. R. 436. *Gardiner* v. *Gray*, 4 Camp. 144. Indeed it may be said generally, that the maxim *expressum facit cessare tacitum* is never to be applied in the construction of contracts peremptorily and absolutely, so as to exclude from the contract everything not embraced in the stipulations of the parties. Its legitimate and proper use is, to shu,

out implied agreements on the same or similar subjects as those concerning which the contract speaks; even such exclusion should be extended only so far as to subserve the plain intent of the parties.

If these views are correct, the interpretation of the contract in the present case is free from all difficulty. Giving full effect to the clause in the bill of lading exempting the defendants from liability for losses occasioned by perils of the sea, it does not follow that they thereby assumed all losses which might arise from the capture of the ship and seizure of the cargo by public enemies. The two causes of loss are entirely distinct and diverse, and have no necessary connection with or relation to each other. They belong to entirely different kinds or classes of risks. No inference can be reasonably drawn from the exemption of the carrier by a special agreement from one class or kind, that it was the intention of the parties that he should assume the other for which the law would not hold him liable, if there had been no exception inserted in the contract; or, in other words, that a stipulation exempting the carrier from liability for the consequences of perils of the sea carries with it by implication an agreement to assume the distinct and independent risk of a seizure or capture. Such an inference seems to us not only to be unreasonable and illogical, but to be in direct violation of the plain intention of the parties. The object of the exception was not to enlarge the carriers' liability. On the contrary, the purpose was to put an additional restriction on the risks which they were contented to bear. The special exception was not confined to "acts of God." If it had been, the argument would have had great force that the insertion of an exception, which the law would imply in the absence of any stipulation, indicated an intention on the part of the carriers to exclude this class of risks and to assume all others. It would be difficult to assign any other reason for making a special exception of risks which the law did not impose. But the exemption for which the defendants stipulated included other risks than those comprehended within the class denominated as the acts of God. Perils of the seas embrace not only inevitable accidents arising from tempests,

floods, earthquakes and other dangers happening without the intervention of man, but also those caused by collisions, fires, pirates and other occurrences, to the happening of which human agency directly contributes. Story on Bailm. §§ 511, 512, and notes. *McArthur* v. *Sears*, 21 Wend. 196. 1 Smith's Lead. Cas. (5th Amer. ed.) notes to *Coggs* v. *Bernard*, 315–319, *Plaisted* v. *Boston & Kennebec Co.* 27 Maine, 132. It was to escape liability for losses occasioned by risks of the latter character that the special exception was inserted in the bill of lading. It was designed to confine the risks for which the defendants were to be liable within narrower limits than those affixed to the contract of affreightment by the general rules of law. It would be a gross perversion of the plain intent of the parties to hold that by such a restriction the liability of the carriers was increased, and the burden of additional risks thereby assumed by them for which, in the absence of any stipulation, they would be exempted by legal implication.

It follows from this view of the contract of affreightment into which the parties entered, that the doctrine, well established and familiar, that a party who takes on himself a duty or charge is bound to fulfil or perform it, and cannot allege any accident or necessity, however inevitable or overwhelming, as an excuse for a failure to keep his stipulations, cannot be applied in the present case, as is urged by the counsel for the plaintiffs, so as to enlarge the liability of the defendants as carriers at common law. If we are right in the exposition we have given to the stipulations of the parties, there was no agreement, either express or implied, that the defendants should undertake any of the risks from which common carriers are usually exempted, but on the contrary, the effect of the clause in the bill of lading excepting perils of the sea from the risks assumed by the defendants was to extend this legal exemption, and to relieve the defendants from certain risks for which they would have been liable but for this special stipulation in the contract of shipment. The cases cited by the plaintiffs' counsel do not support his argument None of them are adjudications on the liability of common carriers. They all relate to special charter parties or contracts o.

affreightment for the carriage of goods in vessels, in which the shipowner let his ship for a voyage, or agreed to carry a specific cargo, and did not hold himself out to carry merchandise for persons generally. In such cases, the shipowner cannot be regarded as a common carrier. He is not subject to the risks or entitled to the exemptions which the law attaches to persons acting in that capacity. His liability must depend entirely on the special agreement for the transportation of merchandise into which he has entered. If he has agreed absolutely to carry it to a particular place, he cannot set up as a sufficient reason for the non-performance of his contract any special ground of exemption for which he did not stipulate. The precise question which we have been considering seems not to have been settled in the English courts. It was raised but not determined in the case of *Bever* v. *Tomlinson*, reported in Abbott on Shipping, (7th ed.) 386. It is not likely to arise again there, because the form of bills of lading now usually adopted in England contains an express exception, exempting shipowners from liability for losses caused by the act of God and the public enemy, as well as from many other risks commonly embraced within the general description of perils of the seas. Nor has the question heretofore come up for express adjudication in the courts in this country. In *Williams* v. *Grant*, 1 Conn. 487, 492, it was said that common carriers are not liable for losses by the act of God, whether the bill of lading contains any exception of them or not; and the same doctrine was reasserted in *Crosby* v. *Fitch*, 12 Conn. 410. These *dicta* seem to accord with the views which we have taken of the proper effect to be given to a special exception of particular risks in a bill of lading. Certainly no authority has been cited, and none we believe can be found, to sustain the proposition urged in behalf of the plaintiffs, that an exception of perils of the seas of itself operates to render a common carrier liable for other risks of a different character, from which he would otherwise be exempted by the general rule of law, or, in other words, that it is equivalent to a distinct stipulation by the carrier to assume the risk of loss caused by a public enemy. Story on Bailm. § 550. In the absence of any binding authority, we cannot give our sanction

to a conclusion which is not warranted by any just rule of expo-sition, and which seems to be contrary to the plain intention of the parties to the contract.

The result is, that the defendants are not liable for a loss of the property intrusted to them, caused either by public enemies or perils of the sea. From the former, they are exempted by the rule of the common law ; from the latter, by force of the special exception inserted in the bill of lading. In this aspect, it be-comes unnecessary to determine definitely the precise *status* to be ascribed to the persons by whom the defendants' vessel was seized, and the ice belonging to the plaintiffs was taken posses-sion of and carried away. If, for the reason that their acts were entirely unlawful and in violation of the laws of the United States, they are to be deemed common robbers or plunderers on the high seas, the loss was occasioned by pirates, and falls within the designation of a peril of the sea. Story on Bailm. §§ 37, *note*, 512. 3 Kent Com. (6th ed.) 216. *Pickering* v. *Barkley*, 2 Rol. Ab. 248. *Barton* v. *Walliford*, Comb. 56. Abbott on Shipping, (7th ed.) 385. If they can be regarded as agents of a *de facto* government, engaged in an actually existing state of war with the United States, then the loss happened in conse-quence of a seizure by a public enemy. *Dole* v. *New England Ins. Co.* 6 Allen, 373–392. It cannot be doubted that the acts by which the ice was taken fall within one of these two classes of risks, for neither of which, on the grounds already stated, can the defendants be held liable.

*Judgment for the defendants.*