## HENRY MICHAELS and ISRAEL SLOMAN v. THE NEW YORK CENTRAL RAILROAD COMPANY.

A common carrier. to exempt himself from liability for injuries happening to goods while he is engaged in transporting them for hire, must show that he was free from fault at the time the injury or damage occurred, and that no act or neglect of his concurred in or contributed to the injury.

If he has departed from the line of duty, and has violated his contract, and, while thus in fault, and in consequence of that fault, the goods are injured, by an act of God, which would not otherwise have produced the injury, then the carrier is not protected.

When goods are delivered to a railroad company, by a connecting railroad company, to be transported to the owners, and the same are received by such company for that purpose, it becomes its duty to send them off, immediately; and it cannot justify the detention of the goods on the ground that, by its regulations, goods received from a connecting road are not to be forwarded until the receipt of a bill of back charges, and that no such bill accompanied the goods.

The defendant, a common carrier, received, at Albany, from the Hudson River Railroad Company, a box of goods to be transported to Rochester and delivered to the owners, for hire. Instead of forwarding the box immediately, it detained the same in its freight house at Albany, to await the rendering of a bill for back charges, by the Hudson River Railroad Company. While so detained, the goods were injured by being wet by an unusual and extraordinary rise in the waters of the Hudson river. *Held* that the detention of the goods was negligence on the part of the defendant; and that such negligence having concurred in and contributed to the injury to the goods, the defendant was precluded from claiming the exemption from liability which the law would otherwise extend to it.

*Held, also*, in an action brought by the owners of the goods, against the carrier, to recover for the damage done to the goods, that the judge, on the trial. properly refused to direct a verdict for the defendant on the ground that the injury complained of was caused by the act of God, and without any fault or negligence on the part of the defendant; or because the goods were in the possession of the defendant, at the time, in the character of a warehouse-man, and not as a common carrier.

*Held, further*, that the judge properly instructed the jury that. under the evidence, the defendant was liable as a common carrier for the damages sustained by the plaintiffs; and that the only question to be considered was the amount of damages.

### Appeal from a judgment of the Supreme Court.

THE action was against the defendants as common carriers, and the complaint alleged that about the 1st of Feb-

ruary, 1857, there was delivered to them, at the city of Albany, a case of goods containing valuable cloths and velvets, belonging to the plaintiffs, for transportation to the city of Rochester; that the defendants carelessly and negligently allowed said goods, while in their possession as common carriers, to be wet and damaged; that the defendants delivered the goods in the city of Rochester on the 17th of February, 1857, but that the same were injured and damaged by reason of being wet, and that such damage to the plaintiffs amounts to $110.35. The defendants answered generally denying the allegations of the complaint, and alleging as an affirmative defense that the alleged injury to the goods was occasioned by the act of God, and not by or through any negligence or carelessness of the defendants, nor had the defendants the ability or power to avoid the same; and they are not liable in damages for such injury.

The action was tried at the Monroe circuit, in January, 1859, before Mr. Justice STRONG and a jury. These facts appeared on the trial: The defendants were, in 1857, common carriers. On the 5th of February of that year there was delivered to the defendants, by the Hudson River Railroad Company, at Albany, three cases of dry goods, the property of the plaintiffs, for transportation for him, from the city of Albany to the city of Rochester. The cases of goods had been purchased by the plaintiffs from the same house in the city of New York, at the same time. Two of the three cases were received in Rochester by the defendants railroad, between the 1st and 7th of February, but the third case did not reach Rochester until the 17th of February, and then the goods were in a damaged condition, which was caused by their being wet, on the 8th and 9th of February, while in the defendants' possession. The damage sustained by the plaintiffs amounted to $100.

It appeared that the case or cases of goods, on being received from the Hudson River Railroad Company, were

deposited in a freight house of the defendants in Albany, designated as "B," between Water and Quackenbush streets, and thirteen or fourteen feet above the ordinary tides in the river.   One of the cases of goods was in this freight house on the 8th February (Sunday), and on that night and the day following there was an extraordinary and unusual rise of the waters of the Hudson river, and an extraordinary and unusual flood, by which the waters became several feet deep in the streets in the business part of the city of Albany, and contiguous to the defendants' freight house.   This flood was occasioned by the blocking up of the river channel by ice, and thus throwing the water back.   There had been no premonitions of this flood at Albany on Saturday (7th February), except that the weather had been a little soft.   The freight house, except as against such a flood, was a safe and secure place to keep and protect goods, and at no period within thirty years had there been so great a flood, or any rise or flood that would have damaged the case of goods in the freight house in which it was deposited.   On Sunday night, about twelve o'clock, the watchman at the freight house notified the defendants' freight agent that the water was rising very rapidly towards the freight house.   He collected men and went to them, but did not go into building "B," as the water had surrounded it.   About one o'clock the water commenced falling, and fell three feet in half an hour.   At this time the water in building "B" had been only a little over the floor. In fifteen or twenty minutes more the water began to rise again, and rose rapidly.   It continued rising until seven or eight o'clock in the morning, at which latter time it was about four feet in height in building "B."   The defendants had some twelve men about their eight freight houses trying to secure the goods.   When the freight agent went into ".B" a day or two after the water subsided, he saw the case of goods in question lying on a piece of boiler iron, placed across two barrels that were standing on end.   The goods were damaged by this rise of water.   The case was in the

freight house two or three days before the flood. The defendants were allowed to prove by their freight agent, under objection, and as a reason for not sending on the third case of goods sooner, that there was no bill of back charges accompanying it; that one of the defendants' regulations was, and always had been, not to ship property received by it from connecting roads until a bill of back charges upon such property is received, and to ship the property by such bills; that this custom and regulation was known to the Hudson River Railroad Company; that they receive the goods to be forwarded, but not to be forwarded until the expense bill or bills of back charges are furnished. This witness was not able to state whether there were any back charges, or whether the case of goods was sent on to Rochester in its damaged condition before back charges were ascertained, or that any measures were taken to ascertain them. He testified generally that no bill of back charges accompanied the case when it was received by the defendants for transportation; but that all he knew of the matter was, that he could find no entry on the defendants' books in regard to it, and no bill had been sent to him from the defendants' office, which was uniformly done.

The defendants offered to show by the freight agent, that it was the custom among forwarders at Albany to receive goods sent to them by other forwarders to be forwarded unaccompanied by expense bills, and hold them in store until such bill was furnished. The court sustained an objection to this offer and excluded the evidence, and the defendants excepted. At the close of the case, the defendants' counsel requested the judge to direct a verdict for the defendants on the grounds:

1. That it appeared by the evidence that the injury complained of was caused by the act of God, and without any fault or negligence on the part of the defendants, and that the defendants could not for that reason be made liable.

2. That as appeared by the evidence the said box, at the time the alleged injury was sustained, was in the possession

of the defendant in the character of a warehouseman, and not of a common carrier of goods, and for that reason the defendant could not be held liable as such common carrier.

But the court refused so to direct the jury, to which refusal the defendants excepted, and instructed them that, under the evidence, the defendants were liable as common carriers for the damages sustained by the plaintiffs, and that the only question for the jury to consider was the amount of damages. To this there was an exception.

The jury rendered a verdict for the plaintiffs for $100. On appeal to the supreme court, the judgment was affirmed. The defendants then appealed to this court.

*S. T. Fairchild,* for the appellant.

*C. K. Smith,* for the respondent.

Wright, J. The duty and liability of a carrier begins when the goods are received into his custody for transportation, and ends when they are securely and safely carried and delivered to the owner. He is responsible for every injury sustained by them, occasioned by any means whatever, except only the act of God or the public enemies. On the 5th February, 1857, the defendants as carriers, and not as warehousemen, received at Albany, to be transported to Rochester, a box containing cloths and velvets, belonging to the plaintiffs, and twelve days afterwards delivered the property at Rochester in a wet and damaged condition. For this injury they were liable, unless it was occasioned by one or the other of the causes which legally excuse them. A ground of defense was, that the injury was by the act of God, and not by or through any negligence on their part. If the damages resulted from "the act of God," spoken of in the law of carriers, and the defendants were without fault, the court below was wrong in adjudging them liable. This is the principal, if not the only question in the case.

There was no conflicting evidence, and neither party

asked to go to the jury on any disputed fact. We are to see then what the case was as the evidence presented it. The box containing the goods damaged, was one of three purchased together in the city of New York, about the 1st February, by the plaintiffs, who were merchants at Rochester. Two of the boxes came to the plaintiffs' hands over the defendants' railroad, not later than the 7th February. The defendants admit that the three boxes were delivered to them at Albany on the 5th of February, to be transported to the city of Rochester; and the inference is almost irresistible that two of them were at once forwarded, and the third, by the negligence of the defendants' employees, left behind. The excuse offered for not forwarding the injured parcel was, that no bill of charges for transportation by the Hudson River Railroad Company accompanied it, and that it was one of the defendants' regulations, known to the latter company, to receive from it goods to be forwarded, but not to forward them, until bills of back charges were furnished. It was not shown that there were any back charges, and some days after the goods had been damaged, the defendants forwarded them without any expense bill. The defendants had at Albany eight buildings for the reception of freight to be carried, in one of which the damaged box was deposited. These buildings were situated near the docks upon Hudson river, and not, as subsequently appeared, out of the reach of a rise of water by damming the river with ice below the city in time of a freshet. On the 8th February, and after the goods had been in possession of the carrier three days at least, one of these freshets, not uncommon in the upper sources and tributaries of the Hudson, and at Albany, occurred, breaking up the ice in the river, creating an ice obstruction at the *overslaugh*, and setting the increased volume of water back upon the lower streets of the city. There had been slight indications of this freshet at Albany the day before, but whether there had been on Sunday (on the night of which the flood reached its height), the case does not disclose. It is reasonable to

presume that this must have been the case, as the water was rapidly rising at ten o'clock that night, and at twelve o'clock had reached the defendants' freight houses, which were some thirteen feet above the ordinary tides in the river, and before it subsided, which was eight hours afterwards, had risen four feet in one of the buildings. This rise of water was an unusual and extraordinary one, the like of which had occurred at no period for thirty years previously. Except as against such a rise, the freight house of the defendants was a safe and secure place to keep and protect goods, and at no time for thirty years had there been any rise or flood that would have damaged the plaintiffs' goods in the freight buildings in which they were deposited. The goods were wet by this rise of the water, and damaged. It seems that the defendants took no steps to protect the property against the probable effects of the rise after it had commenced, until about twelve o'clock on Sunday night, when their freight agent was first apprised by another employee, that the river was rising rapidly towards the freight house; but it appears quite clear, that if at this time, anything had been done in that direction, the plaintiffs' goods would have escaped injury from the water. The freight agent did not go or send any person into building " B " where the goods were on first visiting the freight house, and the reason assigned was, that the building was surrounded by water. About one o'clock in the morning, the water began falling, and fell three feet in half an hour. It had then risen but a little over the floor in building " B." Had the men at that time sent to the building, raised the plaintiffs' box of goods from the floor, no injury would have occurred. Nothing, however, of the kind was done. The direction was to place the cars along by the floors of the freight house, and load in the goods, but this was impracticable because the tracks were blocked up with ice. Shortly thereafter the water commenced rising again, and continued to rise until seven or eight o'clock in the morning, at which latter time it was about four feet in

height in building " B." During this period, and while they were able to work there, some of the defendants' employees were engaged in raising the freight from the floor of the building. They laid the plaintiffs' box of goods on a piece of boiler iron, placed across two barrels standing on end; which, if the same thing had been done before the second rise of water, would doubtless have avoided the injury.

This was, in substance, the case disclosed, and the question recurs whether the judge erred in holding the defendants liable. In other words, whether the defendants, as carriers, brought themselves within one of the two exceptions to their legal liability. What is precisely meant by the expression, " act of God," as used in the case of carriers, has undergone discussion, but it is agreed that the notion of exception is those losses and injuries occasioned exclusively by natural causes, such as could not be prevented by human care, skill and foresight. All the cases agree in requiring the entire exclusion of human agency from the cause of the injury or loss. If the loss or injury happen in any way through the agency of man, it can not be considered the act of God; nor even if the act or negligence of man contributes to bring or leave the goods of the carrier under the operation of natural causes that work their injury, is he excused. In short, to excuse the carrier the " act of God," or *vis divina*, must be the sole and immediate cause of the injury. If there be any co-operation of man, or any admixture of human means, the injury is not, in a legal sense, the act of God. (*McArthur* v. *Sears*, 21 Wend. 190; *Merritt* v. *Earl*, 31 Barb. 38; affirmed in this court; *Smith* v. *Shepherd*, cited in Abbott on Shipping; *The Trent Navigation Company* v. *Wood*, 3 Esp. R. 127; *Forward* v. *Pittard*, 1 Term R. 27; *Campbell* v. *Moore*, 1 Harp. Law Rep. 468; *McHenry* v. *Railroad Company*, 4 Harrington R. 448; *Sierdett* v. *Hale*, 4 Bing. R. 607; *New Brunswick St. Boat Company* v. *Tiers*, 4 Zabriskie, 697; Edwards on Bailments, 454; Angell on Carriers, § 156.)

The goods were damaged in this case, in consequence of a freshet in the Hudson river, on the 8th and 9th of February. The ice was broken up and lodged in the channel of the river, creating an obstruction to the flow of the water, and setting it back upon the lower part of the city, so that the rise was, in part, at least, the result of the obstruction. The combined influences of the freshet and obstruction produced the rise of water which wet the plaintiffs' goods. They were natural causes, of which the injury was not the direct but the remote consequence. Passing by, however, the question of remoteness of cause and effect, and attributing the damage directly to the rising of the water in the river, was such damage the act of God, in the legal sense of the term? On this point I can not entertain a doubt. There was too much of negligence on the part of the defendants, and too much of human agency creating or entering into the cause of the disaster, to bring the case within the exception to the carrier's absolute liability, for the safety of property which he undertakes to carry. It was shown that there was a flood—no unusual event at Albany—which, in the nature of things, could not have been sudden and unforeseen, and the goods in question being exposed to its effects, were injured. It is said to have been an extraordinary flood, the like of which had not occurred at Albany for thirty years previously. But suppose this were so, if the injury which the flood occasioned could have been avoided or prevented, or if the act or negligence of the defendants contributed to bring the property under the operation of the flood, or entered into the cause of the disaster, the injury can not be considered the act of God. This can not be done, in any case, though the injury proceed directly from natural causes, where it might have been avoided by human prudence and foresight, or where human agency creates or enters into the cause of mischief. This extraordinary flood neither could or would have injured the goods of the plaintiffs, had not the defendants, by their prior act or negligence, placed

them in a situation to be affected by it. And so, also, the flood might have been foreseen, its effects averted, and the goods secured and saved by the exercise of even ordinary care, skill and foresight by the company, or its servants. Had the company received the goods and deposited them outside instead of inside of their freight house, and they had been injured by rain, this, in a certain sense, would have been an injury by an act of God, but no one would pretend that the company was not liable. A carrier is always liable for injuries resulting from his own negligence. Can it make any difference that the goods were in a freight house, that the experience of this freshet showed was located in a dangerous place, and the property in it in danger of destruction in times of high water? I think not. If the defendants misjudged in locating and erecting the building for the deposit of freight to be carried, and they placed it within the reach of any possible effects of freshets, the fault was their own. It was not ordinary but extraordinary prudence which they were bound to exercise in guarding against the effects of any freshet that might possibly occur. Had the defendants left the goods in the open air, fully believing that it would not rain, and they had been injured by a storm, no one would doubt their liability; but I think such liability not more apparent than when they exposed them to the effects of a freshet in a freight house within its reach, which they believed to be a safe place. Suppose, however, the defendants were not guilty of negligence in placing their freight house so near the river as not to have been out of the reach of this particular flood, still it was an act of theirs, and without which, and the further act of putting the goods in it, no injury would have resulted. Had it not been for human intervention, no injury would have occurred by the rise of water. It is not enough that the "act of God," which shall excuse the carrier, is a means, although not the direct and exclusive means, by which loss or injury is produced. In *Smith* v. *Shephard,* (cited in Abbott on Ship-

ping,) where there was no actual negligence on the side of the defendant, the loss happened in this way: Just before the defendant's vessel reached the harbor of Hull, a bank there, formerly shelving, had been rendered precipitous by a great flood, where a vessel sunk by getting on the bank, having a floating mast tied to her. The defendant's vessel striking the mast, was forced towards the bank, where, owing to a change in the bank occasioned by the flood, the loss happened. The natural cause, the act of God in changing the bank, was laid out of the question, as not being the immediate cause, and therefore furnishing no excuse. The fastening of the mast, if not the sinking of the ship to which it was attached, were the only remaining causes, and one, if not both, were obstructions placed there by human agency. In *McArthur* v. *Sears* (21 Wend. 190), human agency intervened to produce the loss, and the carrier was held responsible. Judge COWEN, in an able opinion, considers the meaning of the phrase "act of God," as applied to a carrier's liability, and reaches the conclusion that it is restricted to the act of nature, and implies the entire exclusion of all human agency, whether of the carrier or of third persons. "No matter," he says, "what degree of prudence may be exercised by the carrier and his servants; although the delusion by which it is baffled, or the force by which it is overcome be inevitable, yet if it be the result of human means the carrier is responsible." In *Campbell* v. *Morse* (1 Harp. S. Law Rep. 468), where the wagon of the defendant, who was a common carrier, in which he was carrying goods for hire, stuck fast in fording a creek, and the water rising suddenly damaged the goods, it was adjudged that the defendant was liable for the damage so occasioned; for though the rising of the water was caused by the act of God, the placing of the goods in that situation was the act of man.

Again: The carrier is always liable for an injury resulting from his own negligence; and when that intervenes, he cannot discharge himself by showing that it was occasioned

by one of those occurrences which are termed the act of God. If, by his negligence, property committed to him is brought under the operation of natural causes that work its destruction, or is exposed to such cause of loss, he is responsible. So, also, if, but for his neglect, the injury would have been avoided. In the present case it plainly appears that, but for the misconduct and negligence of the defendants, no injury would have happened to the plaintiffs' goods. They detained the goods at Albany, without any reasonable excuse, until the flood came upon the lower part of the city, and then exposed them to its effects. It is not to be presumed that so extraordinary a flood as inundated the wharves and lower streets of the city on the 8th and 9th February could have not been foreseen, and its effects upon the plaintiffs' property avoided. It must, of necessity, have taken some time for the freshet to have accumulated force enough to break up the ice, pile it up on the overslaugh, and inundate the city. That the flood came suddenly and without warning, or that there were no previous indications of the freshet, is not to be supposed. Yet no steps were taken to avoid its injurious effects upon goods deposited in the defendants' freight houses, until the water had reached the streets surrounding the houses. But even then it was not too late to have prevented the injury. The water had not reached the goods of the plaintiffs, and if then they had been attended to, would have been saved from being damaged. The defendants' employees made no effort in that direction. Their freight agent, after waiting until the water surrounded the building in which the goods were, before visiting the scene of the disaster, assigns that as a reason for not going himself or sending men to raise or remove the goods in that building. He remained about an hour in another building doing nothing, when the water commenced falling, and fell three feet in half an hour. Laborers were then sent to the building where the plaintiffs' box was deposited. The goods had not been damaged at this time, and had the box been raised from the

floor, as it afterwards appears to have been, the goods would have escaped injury. But nothing was done to secure them. About twenty minutes after one o'clock the water commenced rising again, and continued to rise until seven or eight o'clock in the morning. This rise must have been comparatively slow, for it took seven hours to raise the water less than a foot in depth on the floor of the building where the damaged goods were. During all this time, and while the water was rising, no effort was made to secure the goods against injury; at least not until it had occurred. Men did get into the building about the time the water commenced rising the second time, and the rising water should have warned them to do what was subsequently done after the goods had received the injury, namely, place the box upon the barrels two and a half feet above the floor. So that there was opportunity enough, if it had been improved, even after the defendants' employees reached the freight houses, to have secured and protected the property in question from injury. The defendants, by their own act or neglect, detained or brought the goods under the operation of the freshet, or natural cause; they negligently failed to foresee the freshet in time to have taken them beyond its reach; and after the freshet had appeared, though there was then sufficient time to secure them against injury, neglected to do so. Under these circumstances, it cannot be reasonably pretended that the defendants, as carriers, were excused from liability. To have excused them, the damage must have been exclusively the result of an act of God, and entirely free from the co-operation of man, which was not the case. By the acts or negligent conduct of the defendants, or the admixture of human means, the goods were brought under the operation of an act of God, which worked the injury; and even the injury might have been avoided by ordinary care, prudence, and foresight. A carrier cannot fold his arms when property is entrusted to him, and because it is subjected to natural causes that may work its destruction, make no effort

to save or protect it from such causes or agencies, and then claim to be exempted from liability. An injury occurring under the circumstances which this case discloses, is, in no legal sense, an injury caused by "the act of God."

Another ground on which the judge was requested to direct a verdict for the defendants was, that the box of goods, at the time the injury was sustained, was in their possession in the character of warehouse-men, and not as common carriers of goods. There is nothing in this point. The defendants, in their stipulation, admitted that they were common carriers, and, as such, the box in question, with two others, was delivered to them at Albany, on the 5th February, to be transported for hire from that place to the city of Rochester. There was not the shadow of proof in the case tending to show that the goods were in their custody as warehouse-men when the injury occurred. It was attempted on the trial to excuse their negligence in transporting the goods to their place of destination, by showing that no bill of charges of the Hudson River Railroad Company had been furnished, agreeably to a regulation of the defendants; but it was not claimed or pretended that the goods had been delivered to them, or were in their custody, otherwise than as carriers.

On the trial, the defendants were not allowed to show by their freight agent that it was the custom among forwarders at Albany to receive goods sent them by other forwarders, to be forwarded, unaccompanied by expense bills, and hold them in store until such bills were furnished. This was not error. Any such custom was entirely immaterial; and could not affect the rights of the parties. The defendants received the goods into their possession as carriers, on the 5th February, and their liability as such forthwith attached, without regard to any custom prevailing among warehouse-men or forwarders at Albany.

The judgment should be affirmed.

37

DAVIES, J.   The defendants, as common carriers, received, at Albany, on the 5th of February, 1857, three boxes of dry goods, in good order, to be transported from Albany to Rochester, for a consideration which was to be paid on delivery.   Two of said boxes were forwarded immediately, on their arrival at Albany by the Hudson River Railroad; and the other, not being accompanied by a bill of back charges from the Hudson River Railroad, was detained by the appellants at their warehouse in Albany.   While so detained, the contents of said box were injured by being wet by a rise in the Hudson river, on the 7th, 8th and 9th days of February, 1857.   This box was afterwards shipped to, and on or about the 17th day of February, 1857, received by the respondents, unaccompanied by a bill of back charges from the Hudson River Railroad Company. Said goods, while so detained at Albany, were damaged by the said flood, to the extent of $100.   The jury, under the direction of the court, found a verdict for the plaintiffs, and judgment thereon was affirmed at the general term.

Two questions are presented for consideration in this case.

1. Whether the defendants are excusable for the detention of the box at Albany; if not, then was it negligence in them so to do?

2. The injury having happened to the goods by an act of God, are the defendants responsible for that injury, under the circumstances presented in this case?

The law is well settled that common carriers, while engaged in the transportation of goods for hire, are not responsible for injuries to them, caused by an act of God, or the public enemy.   With the exception of injuries thus caused, they are liable for all damage to goods entrusted to them, while under their care and control.   For the reasons stated in the opinion in the case of *Read* v. *Spaulding*, decided at this term, the carrier, to exempt himself, must show that he was free from fault at the time the injury or damage happened.   He must show that he was without

fault himself, and that no act or neglect of his concurred in or contributed to the injury. If he has departed from the line of duty, and has violated his contract, and while thus in fault, and in consequence of that fault, the goods are injured by an act of God, which would not otherwise have produced the injury, then the carrier is not protected. In the present case, it is apparent that if the goods had not been detained at Albany until the happening of the flood, no injury to them would have occurred. The question then recurs, was such detention justifiable, or was it negligence on the part of the defendants? They seek to justify it, on the ground that by their regulations, goods received from a connecting road, were not forwarded until the receipt of a bill of back charges. When the goods in the present case were delivered to the defendants by the Hudson River Railroad Company, who in this respect, acted as the agents of the plaintiffs, to be transported to Rochester, and the same was received by them for that purpose, it became the duty of the defendants immediately to send them off. If the Hudson River Railroad Company delivered no bill of back charges with the goods, nor gave any notice that any such existed, the defendants should have assumed that there were none, and they would have been justified in delivering the goods to the plaintiffs, without any claim for such charges. Clearly the Hudson River Railroad Company could have had no claim upon the defendants for any bill for back charges. They discharged their lien upon the goods for such back charges, by the delivery of the same to the defendants, to be carried and delivered to the plaintiffs without any notice of claim for any such charges; and if any existed, they would have been remitted therefor to their claim against the plaintiffs personally.

I am unable to see any justification to the defendants, for detaining the plaintiffs' goods because the Hudson River Railroad Company did not present a bill for back charges. It's omission to do so, or to give notice that such charges existed, should have been taken as evidence, by the defend-

ants, that in fact there were no back charges. The ground assumed, that they were justified in detaining the goods until a bill of back charges was presented, cannot be maintained. The regulation of the defendants may be reasonable enough as between the two companies, but it cannot be permitted to affect the rights of third parties, ignorant of its existence, and who cannot be presumed to have contracted with reference to it. If the defendants were not excusable for the detention of the box of goods in Albany, to await the rendering of a bill for back charges by the Hudson River Railroad Company, then such detention was negligence on their part. Such negligence having concurred in and contributed to the injury to the plaintiffs' goods, they are precluded from claiming the exemption from liability which the law would otherwise extend to them. The court, on the trial, properly, therefore, refused to give the instructions asked for by the defendants' counsel, and the instructions and charge to the jury were such as, under the facts proven, it was the duty of the court to give. The judgment appealed from should be affirmed, with costs.

Denio, Ch. J., was for affirmance on the ground stated by Davies, J., and lastly stated by Wright, J.; but did not know that he could concur with Wright, J., as to what is " an act of God." All the other judges concurred with the chief judge, except Selden and Ingraham, JJ., who did not sit in the case.

Judgment affirmed.