enough to go to work under our labor statutes to make an election as to whether he will work under the compensation law or the common law. Dickens v. Carr, 84 Mo. 658. By the New Jersey act the infant may exercise the option through his guardian. See Sexton Case, supra. In the Borgnis Case, supra, it was said:

"There is no claim that the Legislature may not endow minors with the right to make contracts otherwise lawful."

[5] While I have thus frankly stated my views, I must not overlook the serious consequences which may follow from the Trial Term court interfering with this act of the Legislature. If the plaintiff were the only one interested, I should have no hesitancy in deciding that she might maintain this action; but she is not the only one interested. This act gives to all injured employés, irrespective of contributory negligence or their ability to maintain a common-law action, certain definite sums of money when injured. Notice, however, must be given by the employé within the time prescribed by the act and other formalities complied with. Through a desire for more money or the persuasions of lawyers many injured employés, in reliance upon my decision, might be inclined to forego the compensation given by the statute and resort to an action for negligence. The Court of Appeals might subsequently determine that in this manner I was in error, or that in the light of subsequent decisions (Second Employers' Liability Cases, 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. [N. S.] 44), the Ives Case should be modified in its limitations of the police power. In such a case the result would be that all such employés would have lost forever all rights under the Compensation Act and also would be barred from an action for damages. In other words, all their rights might be made to depend upon the correctness of the view of one judge. Such widespread consequences create a situation where the Trial Term should not declare a legislative act inoperative, even though the judge were of such an opinion.

I have examined all of the points which have been raised by the briefs; I have given my opinion of them as above stated, but for reasons that work, in my judgment, for the proper and orderly administration of justice in the courts, I must overrule the demurrer and hold that the plaintiff cannot maintain this action, at least until a court of final authority passes upon the question.

---

BARNET et al. v, NEW YORK CENT. & H. R. R. CO. (No. 88/67.)

(Supreme Court, Appellate Division, Third Department. May 5, 1915.)

1. CARRIERS ⬤149½—INJURY OR DESTRUCTION OF GOODS—LIMITATION OF LIABILITY—STATUTORY PROVISIONS.

Under the Carmack amendment to the Interstate Commerce Act (Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 593 [Comp. St. 1913, § 8592, pars. 11, 12]) requiring carriers to issue a receipt or bill of lading, and providing that no contract, receipt, or regulation shall exempt such carrier from the liability thereby imposed to the holder of the receipt or bill of lading, a provision in a bill of lading for an interstate ship-

ment that the carrier should not be liable for any loss or damage caused by the act of God, etc., would be disregarded as violative of the statute in determining the carrier's liability for injuries caused by high water.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 651–653, 660–662; Dec. Dig. ☞149½.]

2. CARRIERS ☞123—INJURY OR DESTRUCTION OF GOODS—PROXIMATE CAUSE.
When a car containing a shipment of goods by plaintiff reached the carrier's yards, the water in a river, by reason of an unusual freshet, was 2⅜ feet higher than the highest previous record. The water continued to rise until it reached unslaked lime in another car in the yards, causing the lime to burn and destroy plaintiff's goods. *Held*, that the carrier's negligence, if it was negligent in placing plaintiff's goods near the car of lime, was the proximate cause of the destruction of the goods.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 506, 507, 539–543; Dec. Dig. ☞123.]

3. CARRIERS ☞136—INJURY OR DESTRUCTION OF GOODS—QUESTIONS FOR JURY.
Whether the placing of the car near the car of unslaked lime was negligence was a question for the jury, as the carrier owed plaintiff an active duty to use reasonable care not to expose his property unnecessarily, and it knew or was chargeable with knowledge that, if the water reached the lime, a fire would naturally result, and presumably it knew or should have known the contents of the car containing the lime.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 478, 596–598; Dec. Dig. ☞136.]

Smith, P. J., and Howard, J., dissenting.

Appeal from Trial Term, Albany County.

Action by William Barnet and another against the New York Central & Hudson River Railroad Company. From a judgment entered upon the verdict of a jury in favor of plaintiffs, and from an order denying defendant's motion for a new trial upon the minutes, defendant appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Visscher, Whalen & Austin, of Albany (H. Le Roy Austin, of Albany, of counsel), for appellant.

Charles M. Stern, of Albany (Merwyn H. Nellis, of Albany, of counsel), for respondent.

JOHN M. KELLOGG, J. [1] The Carmack amendment to the Interstate Commerce Act (Act June 29, 1906, 34 Stat. 584, c. 3591), so far as we are interested in it, provides that the carrier shall issue a receipt or bill of lading for goods received for transportation "and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it * * * and no contract, receipt, rule, or regulation shall exempt such * * * carrier * * * from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." I agree that this provision controls the shipment in question. The conditions and limitations in the bill of lading may be disregarded as violative of the statute quoted. The liability then rests upon the statute.

The sole question, therefore, is: Was the defendant's negligence the proximate cause of the plaintiff's loss?

[2, 3] An unusual freshet, continuing for some days, caused by the heavy rains within the watershed, raised the water of the Hudson river to an unprecedented height. The peak of the flood was between noon and 1 o'clock in the afternoon on the 28th of March, at which time the water was about five feet higher than the highest previous record. The hydrographic engineer, in the employ of the federal government, swears that at Troy, prior to 1 o'clock on the 27th, the water raised one-fifth of a foot an hour; after that until it reached the peak, one-tenth of a foot an hour, and it fell with the same degree of fall. At this rate of advancement, 24 hours prior to noon on the 28th the water must have been about $2\frac{2}{5}$ feet lower than it was at the peak, which would make the flood at noon on the 27th about $2\frac{3}{5}$ feet higher than any previous flood.

The car left Rensselaer at 10:27 a. m. on the 27th. It does not appear definitely when it arrived at Troy, but probably about noon of that day. When the defendant placed the plaintiff's car in immediate proximity to the car of unslaked lime, it knew that the water was higher than it ever had been known to be before and was still rising. It therefore owed the plaintiff an active duty to use reasonable care not to expose his property unnecessarily. It knew, or was chargeable with knowledge, that if water reached the unslaked lime a fire would naturally result. We may assume that it knew or should have known the contents of the car containing the lime. It is true that the unusual height of the water caused the car containing the lime to burn, but, if the car containing the plaintiff's goods had been properly placed, the burning of that car would have caused the plaintiff no injury. The loss, as a proximate cause, is due to the fact that the defendant negligently placed plaintiff's goods next to the car of lime. The question for the jury was whether, under all the circumstances, the placing of the car was a negligent act on the part of the defendant, which was the proximate cause of the plaintiff's loss. We find no exception calling for reversal.

I favor affirmance. All concur, except HOWARD, J., dissenting in opinion in which SMITH, P. J., concurs.

HOWARD, J. (dissenting). On the 26th day of March, 1913, the New York Central & Hudson River Railroad Company, the defendant herein, received from the plaintiffs, at the city of Rensselaer, N. Y., a quantity of shoddy, valued at $838.19, for shipment to the state of Maine. The railroad gave to the plaintiffs a receipt or bill of lading covering the shipment. The car containing the goods was taken to the Rensselaer yard of the railroad, and the next day, March 27th, it was taken to the Adams Street yard of the defendant at Troy. The regular and natural route of the car was from Rensselaer to Troy, where, in the ordinary course of transportation, it would have been delivered to the Boston & Maine Railroad to be hauled by that road to its destination. The car reached the Adams Street yard shortly before noon of March 27th. For a day or two preceding this shipment, the

waters of the Hudson river had begun to rise, and in the afternoon of March 27th the flood began to assume unusual proportions. No previous flood had ever reached the tracks of the defendant in the Adams Street yard. During the afternoon of March 27th, and during the night following, the waters rose rapidly, and eventually developed into a deluge unprecedented in the history of Troy, and the like of which is unrecorded in the annals of the Weather Bureau and unknown to the oldest inhabitants. The waters reached a point approximately five feet higher than the high-water mark of any other known flood. The car of goods in question had been placed near a car containing unslaked lime, and, when the rising waters came in contact with this lime, it set fire to the car containing the lime, which fire spread to other cars in the yard, including the car in question, and resulted in the complete destruction of the plaintiffs' goods.

The bill of lading given by the railroad to the plaintiffs contained the following conditions:

"Section 1. The carrier or party in possession of any of the property herein described shall be liable for any loss thereof or damage thereto except as hereinafter provided. No carrier or party in possession of any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, quarantine, the authority of law, or the act or default of the shipper or owner, or for differences in the weight of grain, seed or other commodities caused by natural shrinkage or discrepancies in elevator weights."

The cause of action set forth in the complaint is based on the alleged negligence of the defendant in placing the car containing the shoddy in close proximity to the car containing the unslaked lime, which car, the plaintiff alleges, the defendant "knew or had reason to know was likely to be submerged in the then prevailing high water and overflow of the Hudson river * * * and would come in contact with the water and so cause fire to be set in and upon the car containing the said shoddy." The defendant interposes the defense that the goods were destroyed by the act of God, without any negligence on its part, and that therefore, under the terms of the contract as well as under the ruling of the federal courts, the plaintiff cannot recover.

The rule of liability established by the federal courts in cases of damage to property by the act of God, while the property is in the custody of a common carrier, is different from the rule of liability adopted by the courts of the state of New York in such cases. Therefore it first becomes necessary, in the matter before us, to determine which rule is applicable to the facts of this particular case. This shipment was beyond question an interstate shipment, and was therefore subject to the provisions of the Carmack amendment to the Interstate Commerce Act (Act of June 29, 1906, 34 Stat. 584, c. 3591). In People v. N. Y. C., 163 App. Div. 79, 148 N. Y. Supp. 495, this court held that:

Where "Congress has legislated upon the subject, such legislation becomes exclusive, and there is no room for state legislation. The state laws, so far as they cover the same field or relate to the same subject, are superseded absolutely by the federal laws."

This rule is attested by several recent decisions in the Supreme Court of the United States, among which are New York Central Railroad Co. v. Hudson County, 227 U. S. 248, 33 Sup. Ct. 269, 57 L. Ed. 499, and Michigan Central Railroad Co. v. Vreeland, 227 U. S. 59, 33 Sup. Ct. 192, 57 L. Ed. 417, Ann. Cas. 1914C, 176. So far as the conflict between the federal statutes and the statutes of any state is concerned, the law is well settled, and there is no longer any room for argument, but the question which arises here is not between the statutes of the nation and the statutes of the state but between the rulings of the state courts and those of the federal courts. Under the decision in Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257, there can be no doubt that the rules of liability applicable in this case are those prescribed, not by the courts of the state of New York, but by the federal courts. In that case the United States Supreme Court, approving of the language of the Supreme Court of Georgia, quoted from that court as follows:

"Some states allowed carriers to exempt themselves from all or a part of the common-law liability, by rule, regulation, or contract; others did not. The federal courts sitting in the various states were following the local rule; a carrier being held liable in one court when, under the same state of facts, he would be exempt from liability in another. Hence this branch of interstate commerce was being subjected to such a diversity of legislative and judicial holding that it was practically impossible for a shipper, engaged in a business that extended beyond the confines of his own state, or for a carrier whose lines were extensive, to know without considerable investigation and trouble, and even then oftentimes with but little certainty, what would be the carrier's actual responsibility as to goods delivered to it for transportation from one state to another. The congressional action has made an end to this diversity, for the national law is paramount and supersedes all state laws as to the rights and liabilities and exemptions created by such transaction. This was doubtless the purpose of the law; and this purpose will be effectuated, and not impaired or destroyed by the state court's obeying and enforcing the provisions of the federal statute, where applicable to the fact in such cases as shall come before them."

Following this quotation the United States Supreme Court uses this language:

"That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from its general character."

It thus appears from this reasoning and this language that, not only the statutes, but the judicial decisions of the state of New York and of every other state in the Union, are absolutely superseded by the federal legislation and by the rulings of the federal courts on the subject of interstate commerce. Assume that the rule of the federal courts would excuse the defendant from liability in this case, and that the rule of the courts of this state would hold it responsible. If, in such a case, the defendant were sued in the federal courts by another party whose goods were standing in another car on the same track and were burned in the same fire, the incongruous spectacle would present itself of liability on the same state of facts in the one case and exoneration in the other. But it cannot be that the carrier can be held liable under the contract in question in our state courts, when under the same situation he would be exempt from liability in the federal courts.

That would continue the very confusion which the federal statute was enacted to obviate. The federal government has entered the field and assumed exclusive control of the subject of interstate commerce. Not only the federal statutes, but the federal decisions, at least so far as the United States Supreme Court has declared itself, control. All state statutes are ousted of jurisdiction, and all state decisions, so far as they run counter to rules established by the highest federal court, are rendered inoperative. It is true that the federal rule of liability in cases of this character did not grow out of the Interstate Commerce Act or the Carmack amendment, but had been established long prior thereto and applied under the common law; nevertheless, Congress having taken over the whole subject of interstate commerce, the rules of the federal courts developed before, as well as those enunciated since, the statute, must control this subject-matter. The position which I take here is to some extent sustained by the determination in Barstow v. New York, New Haven & Hartford Railroad Co., 158 App. Div. 665, 143 N. Y. Supp. 983.

Under some of the earlier decisions in this state (Michaels v. New York Central Railroad Co., 30 N. Y. 564, 86 Am. Dec. 415; Read v. Spaulding, 30 N. Y. 630, 86 Am. Dec. 426)—decisions which continue to be the law of the state—a carrier who seeks to be excused for nondelivery of goods caused by the act of God must show that no negligence of his concurred in or contributed to the damage of the goods. The federal courts have uniformly adopted a different rule which may be stated as follows:

"Where the proximate cause of damage to goods in the hands of a carrier is an act of God, the carrier is excused from liability, although his own negligence or delay may have contributed to the loss or damage as a remote cause thereof." Railroad Co. v. Reeves, 10 Wall. (77 U. S.) 176, 19 L. Ed. 909.

This has grown to be the fixed doctrine of the federal courts and is consistently followed in that jurisdiction. In Empire State Cattle Co. v. Atchison, T. & S. F. Ry. Co. (C. C.) 135 Fed. 135, the opinion enunciates the doctrine in the federal courts as follows:

"The question here is: If the carrier delayed the shipment for an unreasonable time, but for which he would have been able to deliver the cattle safely, or to deliver them to a connecting carrier by whom they would have been carried beyond danger from an act of God causing loss, is the carrier liable for the consequences of such delay? Upon this question the courts differ widely. The courts of New York, Illinois, and other states hold the defendant liable in such case. The rulings in the federal court are to the contrary"— citing numerous federal authorities.

It being the federal rule and not the state rule which should have been applied to this case, it follows that the defendant was entitled to a dismissal of the complaint at the close of the testimony. The proximate cause of the fire was the flood. If the defendant can be said to have been negligent at all in placing the car containing the plaintiff's goods in proximity to the car of unslaked lime, this was the remote, not the proximate, cause of the fire. It is unnecessary to cite authorities to establish that extraordinary floods come within the category of the acts of God. This flood was absolutely unprecedented. The like of it had never been before known in the history of Troy. It was as un-

expected and was as much a superior force as an earthquake or a tidal wave or a volcanic eruption.

Having concluded· that this case falls within the rule of liability adopted by the federal courts in cases of destruction of property by the act of God, and not within the rule of liability adopted by the courts of this state on that subject, it is unnecessary to proceed further; but, even under the law of this state applicable in such cases, I think the defendant should not have been held liable. The plaintiff swore no witness and offered no evidence. However, from the admissions made by the defendant at the request of the plaintiff, it is disclosed and stands admitted that the goods were destroyed by fire, and that the fire was caused by the slaking of a car load of lime which stood near the car containing the goods in question. Also that the car load of lime was in the defendant's possession and under its control as a common carrier. The above admission standing in the record, the question arises whether it was a negligent act, considering the freshet conditions, to place the plaintiff's car load of goods on a track near the car load of unslaked lime and permit it to remain there. So far as the defendant's negligence goes, this was the only question submitted to the jury. The car load of goods reached the Adams Street yard in Troy before noon, March 27th. The water rose so rapidly that on the next day, March 28th, at noon, the flood had reached its "peak." The plaintiff did not prove or attempt to prove that the defendant knew at the time it placed the car in the yard, or had reasonable cause to know, that the waters would rise so swiftly and to such unprecedented heights. In fact, it could not have been proven, for nobody knew it or suspected it. Neither did the plaintiff prove that it would have been possible for the defendant to plow its engines through these tumbling waters and rescue the car load of goods, even had it attempted to do so. Never before had floods from the Hudson river been on the tracks of the defendant's yard, and the defendant might therefore very properly have assumed that the Adams Street yard was a place of safety. The waters rose mostly during the night of the 27th, and the defendant cannot fairly be charged with negligence in failing to attempt to propel its engines through the rushing floods in the nighttime, over tracks which could not be seen, and which had possibly been destroyed, to remove this car load of goods. In the morning it was too late to operate engines in Troy—the Adams Street ·yard was a lake. Having proven these conditions, the carrier has shown his absolute freedom from negligence, and has therefore fully discharged the burden cast upon it by the courts of this state. Under these conditions, I think that the defendant should not have been held guilty of negligence, and that the verdict of the jury should ·be reversed.