(102 App. Div. 80.)

### O'DONNELL v. CITY of SYRACUSE.

(Supreme Court, Appellate Division, Fourth Department.   March 1, 1905.)

1. MUNICIPAL   CORPORATIONS—SOURCE—OVERFLOW—INJURY   TO   ADJOINING OWNERS—CITY'S LIABILITY.

Defendant city, having been permitted by various legislative acts to use a creek flowing through it for the discharge of sewers, prior to the overflow in question had constructed 23 trunk sewers so as to discharge into the creek, which drained over 75 miles of sewers, 35 of which were along paved streets and covering an area of 760 acres.   The creek had previously overflowed on several occasions, and steps had been taken at various times to clear it of obstructions.   Feasible plans had also been devised to take care of the sewage, independent of the creek, or to confine the water within its bounds, but such plans had not been carried out when a serious freshet occurred, causing the creek to overflow and flood plaintiff's premises, carrying off the soil, sidewalk, trees, etc., and left a deposit of sewage after the waters receded.   *Held*, that the city, having assumed control over the creek for municipal purposes, was liable for such injury.

2. SAME—DAMAGES.

Plaintiff's injuries having been appreciably augmented by the failure of the city to keep the creek clear to its full width, and by the city's use thereof as a trunk sewer, her damages were not limited to such only as accrued from the deposit of sewage, independent of the injuries which would have been occasioned by the overflow of the water of the creek independent of its use as a sewer.

3. SAME—EXTRAORDINARY FRESHET—ACT OF GOD.

Where a city's negligent use of a creek as a trunk sewer materially contributed to an overflow thereof during a freshet, which was not such as should not have been anticipated, the city was not excused from liability on the ground that the overflow was caused by an act of God.

4. SAME—LEGISLATIVE AUTHORITY—EFFECT.

Where the Legislature gave a city permission to discharge its sewage into a creek, and the city thereafter used the creek as a trunk sewer, such legislation did not exempt the city from liability for injuries to an adjoining property owner, caused by an overflow of the creek during a freshet which might have been avoided by the exercise of proper care.

5. SAME—DISCRETION OF OFFICERS.

Where a city converted a creek into an open sewer, creating a nuisance resulting directly in damage to the property of an adjoining owner, the city was not exempt from liability therefor on the ground that the overflow resulted from an error of judgment on the part of its officers in carrying out a plan for the discharge of the sewage.

6. SAME—DAMAGES—CLAIMS—PRESENTATION.

Where notice of a claim for damages was presented both to the acting president and to the clerk of the common council of a city within the pre-

scribed period, such presentation constituted a substantial compliance with Syracuse City Charter, § 461, requiring notice to be presented to the common council.

Hiscock, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by Bridget O'Donnell against the city of Syracuse. From a judgment in favor of plaintiff, entered on a referee's report, defendant appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Walter W. McGee, Corp. Counsel, and Benjamin J. Shove, Asst. Corp. Counsel, for appellant.

Theodore E. Hancock and John N. Mosher, for respondent.

SPRING, J. Onondaga creek has its source among the hills in the southerly part of Onondaga county, flows in a northerly direction, passing through the heart of the city of Syracuse, and empties into Onondaga Lake. For more than 50 years this creek has been the outlet of the sewer system of the city. The plaintiff's premises are on the southerly side of Tallman street in that city, and about 260 feet east of the line of the creek. On the 15th day of December, 1901, in an unusual freshet the creek overflowed its banks, and the water, sewage, and filth overran the premises of the plaintiff, carrying off the sidewalk, the soil, growing trees, vines, and shrubbery, filled her cellar, destroyed its contents, and left a deposit of sewage, slime, and filth after the water receded.

Ordinarily no liability would attach to the city by reason merely of the overflowing of the water. A duty is not cast upon it either to restrain the water within the banks of the stream, or to indemnify its citizens if in time of a freshet their property is injured by the overflowage of the water. If any liability arises, it is because the municipality has so used and appropriated the creek that increased damages resulted to the plaintiff thereby, or else the user carried with it the obligation to conserve the safety of property to the same extent as if the sewage flowed in an artificial channel constructed by the city, and damage was sustained on account of the dereliction in the management of such channel. Syracuse was incorporated as a city in 1847. Since about that time the chief outlet for its sewage has been this creek. As the city grew, the sewer system was extended until at the time of the freshet in December, 1901, there were 23 sewers discharging into the creek. Their aggregate length was 75 miles, 35 of which were along paved streets. The area covered by these sewers was 1,760 acres. The creek was made a public highway in 1801. Chapter 186, p. 529, Laws 1801. The municipal authorities early began to assume dominion over it for sewage purposes. By subdivision 24, § 7, c. 28, p. 46, Laws 1854, the common council of the city was authorized to construct and repair sewers; by subdivision 35 it was empowered "to regulate, straighten, alter and improve the channel of the Onondaga creek, and drain the lands adjacent thereto;" by subdivision 36, "to prevent and prohibit encroachments upon the channel of the Onondaga creek and to

clear out and deepen the same," and to cause obstructions to be removed therefrom. The transmission of this authority was designed for the purpose of enabling the municipality to keep an unobstructed course for the passage of the sewage for the entire width of the stream. The authority of the mayor and common council to "regulate and improve" this channel, and to prevent encroachments therein, was later re-enacted in the revised city charter, edited in 1894 (section 1). Chapter 496, p. 1163, Laws 1872, which authorized the common council to construct a trunk sewer in Harrison and Onondaga streets to Onondaga creek, was another distinct recognition by the Legislature of the right of the city to use the creek for the discharge of its sewage. Without going into further detail, we may say generally that ample authority was vested in the common council to use the creek as an outlet for sewage of the city, and that body accepted this authority, and exercised dominion in constructing its sewers to the creek and in regulating their outflow.

The creek is not a large one, and the astonishing fact is that during all these years, with the increasing growth of the city and the extension of the sewer system, it has during the greater part of the time proved reasonably adequate for the removal of the deposits carried to it. Early in the history of the construction of the sewers there were at times, however, complaints by reason of sewage deposits and slime, which in low water remained along the banks of the creek, or which the water was not sufficient to absorb and carry off, and also from the increased overflowage in times of high water, claimed to be because of the obstructions in the stream or encroachments upon it. Its course is sinuous, and in 1854 ( chapter 86, p. 165) the Legislature appointed commissioners to straighten the channel, and another one was appointed by chapter 508, p. 939, Laws 1855. In 1865 there was an unusual flood, and the water overflowed the banks of the creek, inundating the lower part of the city. Much agitation apparently ensued because of this deluge, and a legislative commission was appointed, composed of the mayor and leading men of the city, to deepen and straighten the channel. These commissioners dredged the channel, removed the bars which had formed across its bed, cleared out the débris and accumulations which had impeded the flow of the water, and thus, by cleaning out the stream, temporarily facilitated the passage of the water and sewage. The creek, however, was the dumping place for tin cans, ashes, cinders, rubbish, and refuse, all of which obstructed the flow of the water, and bars soon re-collected. The mayor and common council were given the authority of commissioners of highways in towns, including the power to build and alter streets in the city (section 30, Revised Charter of 1885; Laws 1885, p. 39, c. 26, amended in Laws 1889, p. 644, c. 475), and the duty of inspecting and keeping the same free of obstructions was with the commissioners of public works as the administrative officer. In 1895 the common council approved of the plan of sewage designated the Gray system, and this was formally substituted in lieu of the existing system by Laws 1898, c. 595, § 151. The chief purpose of this plan was by the construction and maintenance of intercepting sewers to obviate the fouling of the creek. The plan involved the deepening of the channel about four feet, and es-

tablishing a uniform grade along its bed. In 1897 the common council appointed a special committee to investigate the extent of the encroachments upon the creek. The committee in its report of January 11, 1897, covered both the encroachments and the obstructions in the channel, and appreciated the necessity for prompt and energetic action on the part of the municipality to prevent the recurrence of the overflowing and pollution of the creek to the injury of the inhabitants of the city. In their report they say:

"The rapid growth of the city during recent years has made residence districts of the lowlands bordering on the creek, which now sustain a large population. The people so located are constantly increasing in number, and the near future must witness the occupation of the entire section between the city and Onondaga valley. Unless relief can be obtained, these people will never be secure against disaster from recurring floods. The receding waters always leave behind a condition favorable to disease and epidemics affecting the welfare of the entire city. These dangers cannot be averted or sensibly diminished without providing a free waterway, and this necessitates at the outset the abatement of encroachments and obstructions in the channel of the creek. * * * Your committee thinks the time has arrived when the alarm should be sounded without hesitation and without exaggeration, and that the subject of creek improvement should receive the attention which it is only folly to defer."

They made various recommendations pertaining to the straightening and deepening of the water course, the prevention of the deposit of obstructions therein, and the report was formally adopted by the common council. We have not enumerated all the mass of fruitful legislation and investigation bearing upon the subject of the regulation of the creek and the disposal of the sewage by the municipal authorities or under their auspices. The purpose of the summary we have grouped is to ascertain in a general way the extent of the connection of the city with the control of this stream as a depository of its sewage, for that is the fundamental proposition in arriving at the liability of the city for damages caused by the overflowage of water in any aspect of the case which may be presented.

We think the evidence unmistakably demonstrates the constant supervision exercised by the municipal authorities over this waterway for sewage purposes. We would not expect to reach any other conclusion. The stream is the sole outlet of the extensive sewer plant of the city. Its capacity to absorb and carry off the sewage was frequently tested to the full, and beyond. The occupation of the territory contiguous to the stream by residences both augmented its pollution and directed attention the more acutely to its deplorable condition. The increase in the population of the city, and the acceleration given to water collecting therein by the large mileage of paved streets, extended from year to year, also unduly taxed its capacity. Starting, therefore, with the underlying proposition that the city was called upon to exercise affirmatively its governmental functions to reduce to a minimum the dangers likely to result from the use of this creek, and the fact that it realized and undertook in some degree to fulfill the burden imposed upon it, we will briefly examine the facts upon which the learned referee has held the defendant responsible for the injury sustained by the plaintiff by reason of the flood in December, 1901.

There are three crucial facts contained in his report upon which the liability primarily rests. These are the accumulation of ashes, cinders, and rubbish upon the bed of the creek to such an extent that they retarded the flowage of the water; the encroachments upon the banks by adjacent proprietors obstructing its channel; and the construction of bridges across it, with abutments in the center and projecting inward from the shores, thus impeding the waterflow. These findings are well sustained by the evidence; in fact, they are in substance uncontradicted. There was more or less controversy over the extent of the the retardation of the water by these obstacles, but the engineers in behalf of the plaintiff gave abundant evidence from which the deduction may very reasonably be made, as it was by the referee, that the extent of the overflowage in the freshet which deluged the plaintiff's premises was measurably enhanced because of the facts alluded to, and for the existence of which the defendant may well be chargeable. These are simple propositions of fact, following naturally in the order of cause and effect, and involve no delicate legal complications, and the judgment of the plaintiff might well rest upon them without further pursuit of the subject. Mundy v. N. Y., L. E. & W. R. R. Co., 75 Hun, 479, 27 N. Y. Supp. 469; Sammons v. City of Gloversville, 175 N. Y. 346, 67 N. E. 622; section 259, Farnham on Water Rights.

In Blizzard v. Dansville, 175 Pa. 479, 34 Atl. 846, the court say:

"Where a municipality adopts a stream as an open sewer, it is bound to keep open the channel of the stream, and to remove the accumulations that obstruct the flow of the water, and throws it out over its banks upon land of adjoining owners, and there can be no prescriptive right to neglect so plain a municipal duty."

There is, however, another aspect of the case much discussed by the respective counsel, considered by the learned referee, and which we think irrefragably demonstrates the liability of the defendant. It is earnestly contended by the counsel for the appellant that, while the city may be chargeable with damages resulting from the deposit of sewage and filth upon her premises, the liability does not extend to the injuries inflicted by the water, which comprised the bulk of the damages sustained. It is urged that the shrubbery, sidewalks, trees, and soil on her premises would have been washed away, and her cellar filled, and its contents destroyed, irrespective of the use of the stream for sewer purposes. Further, that the additional injuries connected with the sewage were too trifling and infinitesimal to be measured in the calculation, in view of the vastly greater damages proceeding from the flood itself. As already noted, the referee has found that the damages were appreciably augmented by the omission of the municipal authorities to keep the creek clear to its full width, and the argument of counsel overlooks this fact in their estimation of the damages. Waiving this branch of the case, however, the city cannot partition the damages on the lines suggested by the counsel. It has appropriated the creek for sewer purposes, it has made it the trunk or main sewer of the city, and the affirmative obligation inseparably linked with this user throws upon it the burden of paying whatever damages resulted from the overflowage, although the unusual flood was the inducing cause, and responsible for the greater proportion of the damages. The sewage and filth

and slime were left in her cellar and upon her lot after the abatement of the flood, and noxious odors deleterious to health and comfort did emanate from this accumulation. There were accordingly manifest damages to her property fairly traceable to the employment of the creek as a sewer, and these were substantial in amount. The plaintiff, in view of the use of the creek by the city, was not called upon to prove that one item of damage was caused by the sewage and another by the water, and thus separate and specify by a bill of particulars precisely what accrued from each of these causes. An impossible burden would thereby be imposed upon the plaintiff, and the defendant by its conduct has rendered such a separation of the damages unnecessary. The defendant was responsible in a substantial measure for the damages inflicted, and cannot be exonerated by the excuse that the act of God in causing the flood also contributed materially to these injuries. The act of God which relieves from responsibility only applies where no human aid or intervention has contributed to the loss. Merritt v. Earle, 29 N. Y. 115, 86 Am. Dec. 292; Michaels et al. v. N. Y. R. R. Co., 30 N. Y. 564, 86 Am. Dec. 415. As was said in Michaels v. N. Y. C. & H. R. R. R. Co., 30 N. Y. 564, at page 571, 30 N. Y., 86 Am. Dec. 415:

"If the loss or injury happen in any way through the agency of man, it cannot be considered the act of God; nor even if the act or negligence of man contributes to bring or leave the goods of the carrier under the operation of natural causes that work their injury is he excused. In short, to excuse the carrier, the act of God, or vis divina, must be the sole and immediate cause of the injury. If there be any co-operation of man, or any admixture of human means, the injury is not, in a legal sense, the act of God."

The principle is akin to that which obtains in a case where the fault of the person charged co-operates in causing the injury, and without which it would not have occurred (Stringham v. Stewart, 100 N. Y. 516, 3 N. E. 575; Slater v. Mersereau, 64 N. Y. 138; Sutter v. N. Y. C. & H. R. R. R. Co., 79 App. Div. 362, 79 N. Y. Supp. 1106); or to the principle which makes each of the persons responsible for the damages accruing from the creation or continuance of a nuisance (Irvine v. Wood, 51 N. Y. 224, 10 Am. Rep. 603; Simmons et al. v. Everson et al., 124 N. Y. 319, 26 N. E. 911, 21 Am. St. Rep. 676).

The counsel urges the kindred excuse that the flood in question was extraordinary in its severity. The proof hardly warrants that characterization. It was an unusual flood, in that a freshet so large had occurred only at intervals; but they were of sufficient frequency and fraught with a similarity of perils so as to exact of the defendant the most acute vigilance to prevent, as far as possible, the infliction of damages upon their recurrence. The flood of 1865 was as large as the one in December, and a spasmodic attempt succeeding it was made to keep the stream clear, but the effort was confined to a small portion of the stream, and even then to the freeing of the existing channel from rubbish and the gathering bars of sand and silt. The city at that time contained scarcely more than one-third as many inhabitants as dwelt in it in 1901, and yet the warnings of that flood did not bear fruit in any definite effort carried to a conclusion to develop a plan for the purpose of obviating the disasters which were apt at any time to be repeated. Intervening these two larger floods, others had occurred, and

on at least two occasions the maximum height of the overflowing water was within a foot and one-half of that reached in 1901. The watershed drained by the creek was extensive, and the improvements in the city tended to add to the rapidity of the street surface flowage in a flood time. As the capacity of the stream was overtaxed with the sewage, no great foresight was required to anticipate that the unfortunate condition which befel the property of the plaintiff was probable whenever high water occurred. The frequency of these floods, with the effects following them, and which were likely to recur, made a question of fact which the referee has settled against the defendant. Sundheimer v. City of New York, 176 N. Y. 495, 68 N. E. 867; Mundy v. N. Y., L. E. & W. R. R. Co., 75 Hun, 479, 27 N. Y. Supp. 469.

The evidence also shows that the disaster could have been averted. Feasible plans had been devised, one of which had been formally adopted, and their development was within the financial compass of the city, and they were adequate to take care of the sewage independently of the creek, or at least, and with less cost, to confine the water substantially within its bounds. With the notice it had of the inadequacy of the creek in the condition it was, and with the rapidly increasing demands upon it by the growth of the city and the extension of the sewer system, the duty to adopt and carry out some effective plan was pressing upon the municipality. Failing in this imperative, affirmative duty, damages with consequent liability followed. In Seifert v. City of Brooklyn, 101 N. Y. 136, 4 N. E. 321, 54 Am. Rep. 664, the court use this language, at page 143, 101 N. Y., page 324, 4 N. E., 54 Am. Rep. 664:

"We are also of the opinion that the exercise of a judicial or discretionary power by a municipal corporation, which results in a direct and physical injury to the property of an individual, and which from its nature is liable to be repeated and continuous, but is remedial by a change of plan or the adoption of prudential measures, renders the corporation liable for such damages as occur in consequence of its continuance of the original cause after notice, and an omission to adopt such remedial measures as experience has shown to be necessary and proper. Wood's Law of Nuisances, § 752. While in the present case the corporation was under no original obligation to the plaintiff or other citizens to build a sewer at the time and in the manner it did; yet, having exercised the power to do so, and thereby created a private nuisance on its premises, it incurred a duty, having created the necessity for its exercise, and having the power to perform it, of adopting and executing such measures as should abate the nuisance and obviate damages."

See, also, Ahrens v. City of Rochester (Sup.) 90 N. Y. Supp. 744.

Assuming that the Legislature gave permission to the municipality to discharge its sewage into this stream, no right was granted to injure the property of the plaintiff by the creation of a nuisance. If the acceptance of the legislative permission—for at best it was no more than that—inevitably involved the destruction or injury to the property of the plaintiff, she was entitled to adequate compensation therefor. The Legislature could not vest in the municipality the power to deprive her of her property rights without compensation. Sammons v. City of Gloversville, 175 N. Y. 346–352, 67 N. E. 622; Seifert v. City of Brooklyn, 101 N. Y. 136, 4 N. E. 321, 54 Am. Rep. 664; Const. § 6, art. 1.

But the Legislature, in empowering certain officers of a municipality to carry on improvements for the well-being of the city and its inhabitants, never by that permission granted immunity to the city from direct injuries to private property. The scope of the legislative grant is to transmit the power, but it does not erect a shield to protect municipal wrongdoing. Nor do we think that the defendant is acquitted of liability by virtue of the rule which relieves a city for the consequences of acts within the discretion of its officers. The liability does not arise because of any error of judgment in carrying out a plan for the discharge of the sewage. The municipal authorities have converted the creek into an open sewer, creating a nuisance resulting directly in damage to the property of the plaintiff, and the city is liable on account of this overt act. Stoddard v. Village of Saratoga Springs, 127 N. Y. 261–268, 27 N. E. 1030; Noonan v. City of Albany, 79 N. Y. 470, 35 Am. Rep. 540; Munk v. City of Watertown, 67 Hun, 261, 22 N. Y. Supp. 227.

Section 461 of the charter of cities of the second class requires notice of claim to be presented to the common council within three months after the happening of the injuries. Notice in this case was presented both to the acting president and to the clerk of the common council within the prescribed period. This was a substantial compliance with the requirement. McIntee v. Middletown, 80 App. Div. 434–437, 81 N. Y. Supp. 124; Statutory Construction Law, § 20.

The judgment should be affirmed, with costs.

Judgment affirmed, with costs. All concur, McLENNAN, P. J., in result only, except HISCOCK, J., who dissents in an opinion.

HISCOCK, J. (dissenting). The importance of this appeal is not measured by the amount of the judgment recovered in this particular action. Upon the argument it was stated without contradiction that an accumulation of upwards of $200,000 of claims against the city was waiting to follow in the train of this action, if successful. I find myself unable to concur in the conclusion reached by my associates, that the judgment should be affirmed, and, while their decision may so involve questions of fact as to be controlling upon any further appeal in this action, it still seems proper to briefly state the grounds of my dissent.

The plaintiff has been allowed to recover two entirely distinct, independent classes of damages, namely, those resulting from the action of the flood as such upon her property, and, secondly, those resulting from the filth and sewage deposited by the overflow of the creek. I think that her recovery against the city, so far as it is based upon the mere action of the waters, was not warranted. The learned referee held the city liable for this (as distinguished from the sewage) for two reasons: In the first place, he found that it, by means of sewers, conducted a large amount of surface water and drainage into the creek, thus augmenting its volume, and that by the construction of bridges with insufficient spans, and by permitting the channel to be narrowed by various obstructions, it dammed up and retarded the flow, and in a substantial degree caused an increase of water upon plaintiff's premises. In the second place, he found, as I understand his decision, that be-

cause the city used the creek for sewerage purposes it so assumed dominion and control over it that under the powers conferred it became obliged, by widening and deepening, to furnish a channel sufficient not only to carry off the extra water and sewage turned into it, but also sufficient to carry off all of the waterflow and surface drainage which came into the creek naturally and independent of the city. This latter theory of responsibility upon the part of the city is entirely independent of its liability by reason of its increasing and obstructing the natural flow of the creek. It means that, because the city has used the creek for one purpose, it is bound to make it sufficient as a water course or sewer for all other purposes, even though the latter were unchanged and unaffected by its acts.

So far as the first of these grounds is concerned, a careful consideration of all of the evidence seems to demonstrate beyond any reasonable doubt that the extra drainage which the city turned into the creek, and the obstructions which it caused or permitted to exist in the bed thereof, did not in any substantial degree whatever increase the volume of water upon plaintiff's premises or the damages therefrom. Her land was situated upon a comparatively low level. The flood was an extraordinary one. The creek was the only outlet for a valley extending from its outlet to its source, and including a watershed of over 100 square miles exclusive of the city. There was a great quantity of water, both by rainfall and melting of snow, and the ground was already so saturated as not to absorb much of it. Long before the stream had reached any point where it could be said to be affected by the defendant's obstructions, it had carried out dams, overflowed its banks, spread over highways, submerged railroad tracks, and inundated large tracts of country. It inevitably spread over plaintiff's lands, and in my judgment the conclusion that the volume and destructive force of this great torrent, which had been increasing at every foot of its progress for 20 miles, was materially augmented by the flow of the few sewers which emptied above plaintiff's premises, or by the alleged obstructions, is based upon theorizing and the somewhat finely spun deductions of experts, rather than upon a practical and reasonable consideration and weighing of all the evidence.

So far as the second ground of this particular liability is concerned, it is altogether too burdensome a rule, under the circumstances of this case, to hold that, because the city utilized the creek for one purpose, it became bound to make it sufficient for all other purposes and demands which existed independent of it; that, because it drained some sewers into the channel, it so far assumed dominion and responsibility that it became obligated to make such channel adequate and sufficient for such an unusual freshet as occurred in 1901. There was no evidence that a flood of such magnitude ever occurred but once before in the history of the city, and that was nearly 30 years ago. It is apparent that owing to natural conditions, and independent of any complications caused by the city, it would have been a difficult and expensive undertaking to provide for such an emergency as occasioned plaintiff's damages. And while the court may think that the city, in the light of its recent experience and in the exercise of a wise discretion and progressive policy, ought to protect its citizens from the recurrence of any such

disaster, or even may feel that it would have been justified in so doing before the flood of 1901, such view does not by any means lead to or justify the conclusion that the city and its taxpayers are to be made liable because it did not do so. A municipal government is vested with wide powers of discretion as to what improvements it shall make and when it shall undertake them. It is only bound to guard against dangers reasonably to be apprehended. And neither the authorities cited in behalf of plaintiff nor the evidence as a whole seems to me to justify the decision that the city, by its limited and restricted use of the creek, had become liable to protect plaintiff from such an extraordinary emergency as caused her injury, even though such emergency and injury were not in fact altered or increased by any act performed by it.

The second class of damages allowed to plaintiff is for the sewage and filth which were deposited upon her premises. This injury is distinct from that caused by the mere action of the water in injuring and destroying her property, and I think that she was entitled to recover for it. For a long time the city has been accustomed to drain its sewers into the creek. So far as the property owners are concerned, it has done this by sufferance, and without any such precautions as ordinary prudence required. The sewerage into the creek was something for which the city was solely and directly responsible. Its action in this respect involved considerations not only of property, but of health and general welfare, and it was bound to solve these problems in a proper and reasonable way, or else to meet the responsibility for not doing so. Under the circumstances presented in this case, it became liable to see that the sewage which it discharged into the creek did not become a source of injury and damage to property owners. If, after it was discharged into the creek, it was cast upon somebody's lands, a different rule of liability applies than should govern in the case of a flood or natural waterflow, for which the city was not in any way responsible. Having conducted this matter into the channel of the stream, where it might be, and in fact was, thrown upon plaintiff's premises, the city became liable for the damages which resulted therefrom.

These views lead me to the conclusion that the judgment appealed from was erroneous because it included with the damages for a deposit of sewage, for which the city was liable, damages for the results of the flood proper, for which I do not think it was liable.